# Illinois Official Reports

## Appellate Court

---

**People v. Davison, 2019 IL App (1st) 161094**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERELL DAVISON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-16-1094 |
| Filed<br>Rehearing denied | February 8, 2019<br>March 6, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-2885; the Hon. William G. Lacy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Roxanna A. Mason, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Brenda K. Gibbs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Delort and Justice Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant-appellant, Terell Davison, was tried by a jury for the murder of Anthony Jones. Prior to trial, defendant moved to suppress a statement allegedly made during his arrest. After hearing from the arresting officer, the court determined the statement was not the result of police questioning and therefore was admissible at trial. At trial, a Chicago police detective testified that after officers spoke with a witness and another individual at the scene of the shooting, the detective had the names of three suspects: Dee, Little Fred, and Terell Davis.[1] Defendant objected to this as hearsay, but the trial court overruled the objection. The arresting officer also testified to the statement made by the defendant. Defendant testified in his own defense. After hearing all the evidence, the jury convicted defendant of first degree murder and found that he had used a firearm during the commission of the offense. Defendant was sentenced to 30 years for the murder and received an additional 20 years for using a firearm. This appeal follows.

¶ 2      Defendant raises two issues on appeal. He argues (1) the trial court erred in allowing the Chicago police detective to testify to the three names he obtained during the course of the investigation and (2) the trial court improperly shifted the burden at the suppression hearing.

¶ 3      After reviewing the record and relevant case law, and for the reasons stated below, we find no errors in defendant's criminal proceeding and affirm his conviction. The detective's testimony at trial did not contain hearsay and was properly limited to the course of his investigation. The trial court did not shift the burden to defendant at the suppression hearing.

¶ 4      <center>I. JURISDICTION</center>

¶ 5      On January 14, 2016, a jury found defendant guilty of first degree murder. The jury also found defendant used a firearm during the commission of the murder. Defendant filed a motion for a new trial, which the court denied. On March 15, 2016, defendant was sentenced to 50 years in prison. A notice of appeal was filed March 21, 2016. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606 (eff. Feb. 6, 2013), governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6.

¶ 6      <center>II. BACKGROUND</center>

¶ 7      On January 29, 2013, defendant was arrested by the Chicago police for the murder of Anthony Jones. Prior to trial, defendant filed a motion to suppress. The statement, "he was glad he was caught because he was sick of running," was allegedly made during his arrest. The motion alleged the statement was the result of custodial interrogation, and the police had failed to inform him of his *Miranda* rights prior to him making the statement.

¶ 8      Chicago police officer Brian McKendry was the only witness called to testify at the suppression hearing. The defense questioned the officer first. Officer McKendry testified that on the afternoon of January 29, 2013, he and his partner were conducting surveillance at 10110 South Bensley Avenue in Chicago. The officers observed a woman exit the residence they were watching. The officers left their car and approached the woman. They identified

---

[1]As will be discussed in more detail, the officer testified to the name "Terell Davis" not "Davison."

themselves and told the woman why they were in the area. The officers asked for and received permission from the woman to enter the residence she had just exited. After entering the residence, Officer McKendry and his partner proceeded to the basement. Upon reaching the basement, they observed a curtained-off area containing a bed. They pulled back the curtain to find an individual Officer McKendry identified in court as the defendant. The officers found defendant on the ground next to the bed. At the time of his testimony, Officer McKendry could not remember how the defendant was dressed.

¶ 9 The officers confirmed that the individual matched a photo and proceeded to place defendant under arrest. Officer McKendry informed the court that after taking defendant off the basement floor, they took him into a more open space, still in the basement, and placed him in handcuffs. When specifically asked, Officer McKendry testified that defendant made the statement at issue either while he was being handcuffed or just afterwards. Officer McKendry testified, "[h]e stated in general, not verbatim, but he stated that he was glad he was caught because he was tired of running." Officer McKendry admitted that defendant had not been Mirandized at this time.

¶ 10 Officer McKendry denied asking defendant any questions. He stated that upon entering the basement, they announced their office. After pulling back the curtain, he told defendant to "show me your hands" because they could not see defendant's hands. He could not recall if he asked defendant his name at the time of arrest or if he had asked anything else besides "show me your hands."

¶ 11 On cross-examination, Officer McKendry testified that after placing defendant in handcuffs, he checked the area for weapons. Officer McKendry claimed that defendant made the alleged statement just after he had completed a search of the bed area. The statement was made in the presence of both officers while still in the basement. Officer McKendry denied questioning the defendant. He also stated his partner did not ask defendant any questions.

¶ 12 After hearing the testimony of Officer McKendry, the court denied the motion to suppress. The trial court found "no evidence whatsoever that that [*sic*] statement made by the defendant was a result of any questioning by the police or from the police." The court concluded the statement had been spontaneously uttered by the defendant. The parties then proceeded to trial.

¶ 13 At trial, Jesus Magana testified that around 6 p.m. on June 24, 2012, he was driving to his girlfriend's house. While on 130th Street, he hit a pothole and got a flat tire. Magana turned onto Eberhart Street, pulled into a vacant lot, and exited his car to check on the tire. A man unknown to Magana, later identified as Anthony Jones, rode up on a bike and offered to lend Magana assistance in changing the tire. Jones told Magana, "I don't have a job right now, so you know, whatever you got, a few bucks, I'll take that." Magana agreed and Jones said that his uncle lived down the street and had a better car jack than the one in Magana's car. Jones then left for his uncle's house while Magana started unloading the spare tire from the trunk.

¶ 14 Jones returned without a jack, said he would change the tire with Magana's jack, and began to loosen the lug nuts on the tire. After 20 to 30 minutes, Magana noticed Jones's demeanor "was a little different" than when they first met. Magana testified that "[Jones] looked kind of like, I don't know, agitated a little bit, kind of nervous, and he kept looking back. I remember he was smoking a cigarette and he was taking faster and faster puffs from it." Magana then observed three African-American men standing in the playground across the street from the vacant lot. Jones motioned to the three men by holding his hand in a flat manner and waving it near his neck. The men began walking toward Magana and Jones. They crossed a baseball

diamond and walked toward the median of Eberhart Street, at which point they lifted their shirts and flashed guns tucked in their waistband. Magana had an unobstructed view of the men.

¶ 15    When they reached Jones and Magana, one of the men, whom Magana later identified as defendant, started arguing with Jones. During the argument, defendant and Jones stood within two to three feet of Magana. Defendant stood to Magana's left, and Jones stood to his right. The other men were next to defendant. During the encounter, Jones expressed familiarity with defendant, "Terell, don't do this, we're fam." Defendant responded, "[D]on't say Terell, don't call me Terell." Magana did not think defendant was trying to deny his name was Terell.

¶ 16    After addressing defendant as Terell, Jones started briskly walking away from the group and toward the median. The three men followed and eventually opened fire with their guns. Defendant and the other two men shot Jones. After Jones fell, the men formed a semicircle around him and continued to fire. After the shooting stopped, the men ran away; defendant also ran, but "kind of stopped" near Magana and looked at him before finally fleeing the scene. After making sure the men had fled, Magana went over to check on Jones. Jones appeared deceased so Magana called 911. Managa identified photographs of his car (at the scene), the median, the baseball diamond, and the park. He also identified a picture of Jones lying on the ground and the area where the group made a semicircle while shooting Jones. He also identified an aerial photo of the location.

¶ 17    Police officers arrived on the scene, and Magana told them what happened. He described Jones's conversation with defendant as "heated," and individually described each shooter: "a male black, five-ten, 150 pounds, that was somewhere between 18 and 20 years old with black hair and dark brown complexion wearing a white T-shirt and shorts; a male black, five-nine, 160 pounds, 15 to 20 years old, black hair, dark brown complexion wearing a white T-shirt and shorts; and a male black with black hair, dark brown complexion, 18 years of age, with a white T-shirt and short pants." Magana recalled what he told the officers that day about the three individuals, but as he testified at trial, he was unable to describe the individuals. Magana stated, "I can't because I remember the person that was closest to me."

¶ 18    After speaking with officers at the scene, Magana went to the police station and spoke with detectives, including Detective Patrick Ford. Magana provided another description of the individuals: black males, five foot eight inches to six feet tall, two with short hair, white T-shirts and jean shorts, who were 18 to 20 years old with a thin build and medium complexion. The third individual had braids, was wearing a white T-shirt under a red T-shirt with plaid shorts, and was 18 to 22 years old with a thin build. Magana referred to defendant as Terell when he was talking to the detectives because Jones "did express some kind of familiarity when he said Terell," and defendant looked like he was trying to avoid the name being used. Magana told the detectives that Jones addressed one of the individuals as Terell, but he did not, at that time, specifically say which individual was the one whom Jones called Terell. At the time of trial, Magana could not recall the type of hair defendant had on the day of the shooting. Magana explained that given defendant's physical proximity at the scene, he "was more familiar with the face as opposed to like hair or anything else." Of the three shooters, defendant was closest to Magana.

¶ 19    Later that evening, Magana read and signed an advisory form and viewed photos. He flipped through the photos and recognized defendant as the individual Jones had addressed as Terell. Magana told the detective that it could be defendant but he was not sure because pictures

- 4 -

were not the same as seeing someone in person. The next evening, Magana met with detectives at a restaurant, signed another advisory form, and viewed another set of photos. They were different from the first array in that all photos were on the same page. Magana could not identify anyone. On January 30, 2013, Magana went to the police station, viewed a physical lineup, and identified defendant as the shooter whom Jones addressed as Terell. The same day, he viewed another set of photos but could not identify anyone.

¶ 20    Homicide Detective Patrick Ford testified that on the evening of June 24, 2012, he went to the scene of the shooting to investigate. Ford's partners, Detectives Otto and Hill, were on the scene, along with several uniformed officers. Ford interviewed Magana, while Otto and Hill spoke with a civilian named Howard Taylor. After leaving the scene, Ford went to the police station, where he spoke with Magana again and obtained a description of the shooters. After speaking with Magana and his partners, Ford had three names: "Dee, Little Fred, and Terell Davis." Using a computer and "demographics and people fitting that description that had connections to the area," Ford attempted to locate those individuals. A few hours later, he located defendant though his search, obtained a photograph of him, obtained photographs of similar individuals and put together a photo array. Around 9 p.m., Ford showed the photo array to Magana, who identified defendant and wrote "tentative" next to defendant's picture. The following day, Ford, Otto, and Hill met with Magana at a restaurant near Magana's home. They presented him with a second array but Magana did not identify anyone. Ford testified that defendant's photo was not in this array.

¶ 21    Ford issued an investigative alert for defendant on June 25, 2012, and the alert was updated on December 12, 2012. On January 29, 2013, Ford learned defendant had been arrested, so he called Magana in to view a lineup. Magana identified defendant in the lineup. The same day, Ford showed Magana a third photo array, compiled by Hill, which included a person nicknamed "Little Fred." Magana could not identify anyone from this photo array.

¶ 22    The State then called Officer Brian Sheahan about his arrest of defendant. Officer Sheahan testified consistently with his testimony from the suppression hearing. He explained that he and his partner found defendant next to a bed in the basement of 10110 South Bensley Avenue. Upon finding defendant, they stood him up and placed him in handcuffs. They did not Mirandize defendant, but they did not ask him any questions either. Officer Sheahan testified that defendant "blurted out" that he was "glad that [we had] caught him. He was sick of running." Neither Officer Sheahan nor his partner asked any follow-up questions concerning this statement.

¶ 23    Defendant testified in his own defense. Defendant testified that in both June 2012 and January 2013, he was living at 10110 South Bensley Avenue with his aunt and his children's mother. He is familiar with the area of 130th Street and Eberhart Avenue because he lived around that area since he was a child. The house on South Bensley Avenue was about 15 to 20 minutes "straight south" of that area. Defendant was in his room (an area blocked off by sheets) in the basement on the day he was arrested. He was asleep, and his children's mother woke him up and told him the police were upstairs looking for him. She gave him some clothes to put on, and he got up and heard the police asking if he was downstairs. He responded "yes" and the police told him to come out from behind the curtain with his hands up. According to the defendant, he came out with his hands up and the police told him "don't move. Stay there. Come closer." He moved closer to the officers, and they brought him upstairs into the living room. Defendant testified that prior to bringing him upstairs, the officers asked if he knew

someone named "DJ." Defendant told them he knew DJ, and DJ was his friend. Defendant denied saying he was tired of running or that he was glad the police arrested him. He denied shooting Jones on the day in question and denied being at 130th Street and Eberhart Avenue when Jones was shot.

¶ 24    During cross-examination, defendant testified that the police only came to the upstairs door of the basement, and never came down into the basement. According to defendant, they called down to him in the basement and ordered him to come upstairs. His children's mother was sitting right there, and the police asked defendant if he knew DJ. Defendant did not know how many officers were in the home that day. Defendant explained that when the officers asked if he was downstairs, he said yes and came out with his hands up. Later during cross-examination, defendant claimed five police officers were present: two African-Americans and three others.

¶ 25    Defendant claimed to be very familiar with the area of 130th Street because he lived in the area for 7 to 10 years, visited the area to see his brother, and stated that it would not be unusual for him to be around 130th Street and Eberhart Avenue. He knew people around the area, had known Jones since they were 11 or 12 years old when Jones lived behind him, and knew there was a vacant lot and park at 130th Street and Eberhart Avenue. Defendant initially testified that the area behind the lot led to some apartments but there were no houses back there. Defendant then said there were no apartments back there, just a big open field. Later, defendant testified that he had never been through the area toward the back of the open field, but knew that "riding past on the bus you can see. And it gets blocked off." He said the area had houses, an empty field, and more houses.

¶ 26    At the time of his arrest, he was 5 feet 8 inches tall, he weighed 165 pounds, he had shorter hair with "corn rolls and braids," and his nickname was "Rell." Finally, he testified that, on January 29, 2013, his children's mother left the house to take their newborn daughter to the doctor, and that he did not go with her.

¶ 27    After hearing closing arguments, the jury found defendant guilty of first degree murder and that he used a firearm during the commission of the offense. Defendant was sentenced to 30 years for the murder and 20 years for the firearm enhancement. This timely appeal followed.

¶ 28                                III. ANALYSIS[2]

¶ 29    In his first issue, defendant contends that the trial court erred in admitting certain portions of Detective Ford's testimony. Detective Ford testified that as a result of a conversation he had with Magana and a conversation his partner had with non-testifying witness Howard Taylor, he began looking for three individuals: Dee, Little Fred, and Terell Davis. Defendant contends that the detective should not have been allowed to testify to the names Taylor provided because

---

[2]We note that the State argues defendant has forfeited both issues by failing to properly preserve the issues below. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (explaining that in order to preserve an error for appellate review a defendant must both contemporaneously object and include the issue in a posttrial motion). We agree that the record shows neither issue has been properly preserved. Defendant never raised an objection at the suppression hearing or included it in his posttrial motion nor did he include his hearsay argument in a posttrial motion. In the interest of completeness, we choose to overlook defendant's forfeiture and review the merits of defendant's arguments. *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65.

it went beyond what was necessary to explain the detective's subsequent conduct. Defendant further contends that the admission of names violated his right under the sixth amendment because he did not have an opportunity to cross-examine Taylor. The State contends the admission of the names was not hearsay, and therefore no violation of the sixth amendment occurred.

¶ 30 "Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule." *People v. Olinger*, 176 Ill. 2d 326, 357 (1997). The admission of evidence falls within the sound discretion of the trial court, and this court will not reverse "absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Lucas*, 151 Ill. 2d 461, 489 (1992). The abuse of discretion standard applies to a trial court's decision to admit hearsay testimony. *People v. Caffey*, 205 Ill. 2d 52, 89-90 (2001). An abuse of discretion occurs when a trial court acts arbitrarily, fancifully, unreasonably, or if no reasonable person would take the same position. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 31 In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the United States Supreme Court held that the confrontation clause of the sixth amendment forbids the State from offering into evidence testimonial hearsay from an absent witness unless the witness is unavailable and the defendant had a prior opportunity to engage in cross-examination. While hearsay is prohibited, Illinois courts have repeatedly recognized that a police officer may testify to the steps he took during the course of a criminal investigation, and such testimony is not considered hearsay. *People v. Johnson*, 116 Ill. 2d 13, 24 (1987); *People v. Gacho*, 122 Ill. 2d 221, 248 (1988). It is not considered hearsay because the testimony is within the personal knowledge of the officer and not used to prove the truth of the matter asserted. *People v. Sample*, 326 Ill. App. 3d 914, 920 (2001). However, an officer's testimony becomes inadmissible hearsay if the testimony recounts "the substance of a conversation." *Gacho*, 122 Ill. 2d at 248.

¶ 32 After reviewing the testimony of Detective Ford, we conclude that the trial court did not err in admitting the testimony at issue, because Ford never disclosed the substance of what Taylor told his partner or what his partner told him. The relevant portion of Detective Ford's testimony states:

"[STATE'S ATTORNEY]: Did you learn that there was someone else on the scene by the name of Howard Taylor.

[WITNESS]: I did.

[STATE'S ATTORNEY]: Did you speak with that individual?

[WITNESS]: No, I did not.

[STATE'S ATTORNEY]: Who did?

[WITNESS]: Detectives Otto and Hall.

[STATE'S ATTORNEY]: Did you ultimately after being at the scene relocate back to Area South?

[WITNESS]: Yes.

[STATE'S ATTORNEY]: When you went back to Area South, did you have contact with your partners?

[WITNESS]: Yes.

[STATE'S ATTORNEY]: Did you also have contact once again with Magana?

[WITNESS]: Yes.

[STATE'S ATTORNEY]: At this point who are you looking for?

[DEFENSE ATTORNEY]: Objection.

THE COURT: Overruled.

[WITNESS]: I had three names, a nickname of Dee, Little Fred, and Terell Davis.

[STATE'S ATTORNEY]: And did you then make efforts to identify someone by the nickname of Dee, Terell Davis, or Little Fred?

[WITNESS]: I did.

[STATE'S ATTORNEY]: Did you—what efforts did you make?

[WITNESS]: I utilized the computer that was available to me. I attempted to locate through demographics and people fitting that description that had connections back to that area.

[STATE'S ATTORNEY]: Were you able to locate anyone?

[WITNESS]: I was.

[STATE'S ATTORNEY]: And when you located that person, were you able to get that photo of them?

[WITNESS]: I did.

[STATE'S ATTORNEY]: Do you see that person in court today?

[DEFENSE ATTORNEY]: Objection.

THE COURT: Basis?

[DEFENSE ATTORNEY]: That it's hearsay.

THE COURT: Okay, overruled. The person he got the photograph of?

[DEFENSE ATTORNEY]: How he got the photograph.

THE COURT: That's not what the question was.

[STATE'S ATTORNEY]: Do you see the person you got the photograph of during your procedure in court today?

[WITNESS]: I do.

[STATE'S ATTORNEY]: Can you point to him and describe an item of clothing that he's wearing?

[WITNESS]: He's the male black to my left wearing the white shirt.

[STATE'S ATTORNEY]: Your Honor, may the record reflect an in-court identification of the defendant.

THE COURT: It may."

The relevant portion of the testimony above demonstrates that at no point did Detective Ford testify to the substance of statements made by either Taylor or any other officer who may have talked with Taylor. See *id.* (concluding that an officer's testimony crosses into inadmissible hearsay when it recounts the *substance* of the conversation). While the implication of his testimony is that Taylor provided the names of defendant and two others as individuals connected to the murder, this implication does not render the testimony hearsay or inadmissible. *Johnson*, 116 Ill. 2d at 24.

¶ 33 Detective Ford's testimony was correctly limited to the conduct of his own investigation and did not contain the substance of any non-testifying witnesses' statements. In *Johnson*, the

supreme court found the detective's testimony crossed the line into hearsay because "the detective went on to explain that [codefendant], after his arrest, implicated the defendant in the scheme and said that the defendant was the gunman." *Id.* at 24-25. Similarly, in *People v. Singletary*, 273 Ill. App. 3d 1076, 1084 (1995), this court found an officer's testimony crossed into hearsay when he testified "regarding his conversation with the confidential informant that 'he was going to go to 2971 South Dearborn and pick up a package of cocaine' " from the defendant. Unlike the officers' testimony in *Johnson* and *Singletary*, Detective Ford did not testify as to any statements made by Taylor to his partner or from his partner to himself. While defendant is adamant that the testimony at issue is hearsay, the fault in his argument is exposed by the fact that he never identifies any substantive statements made by Taylor or another non-testifying individual contained within Detective Ford's testimony.

¶ 34    Detective Ford's testimony was correctly limited to the investigatory steps he took leading up to the identification of defendant and demonstrated defendant's arrest was not purely coincidental. *Sample*, 326 Ill. App. 3d at 920 (citing *People v. Cameron*, 189 Ill. App. 3d 998, 1004 (1989)). Detective Ford's testimony regarding the three individuals he began looking for did not constitute hearsay, and the trial court did not err in admitting it. Given that the testimony at issue did not constitute hearsay, it follows that defendant's right under the confrontation clause of the sixth amendment was not violated. *Crawford*, 541 U.S. at 68.

¶ 35    In his second issue, defendant argues that the trial court applied the wrong legal standard when ruling on his motion to suppress. Defendant claims that the trial court improperly shifted the burden to him and denied the motion because he failed to prove the arresting officers asked him questions eliciting the incriminating response "he was tired of running and glad the police caught him."

¶ 36    The State bears the burden of proving by a preponderance of the evidence that the defendant voluntarily uttered the statement at issue. *People v. R.D.*, 155 Ill. 2d 122, 134 (1993). The trial court may allow a defendant to present his or her evidence first, but the State always bears the burden of establishing a *prima facie* case that defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights. *People v. Reid*, 136 Ill. 3d 27, 51 (1990). Only after a *prima facie* case has been established does the burden shift to defendant to prove the waiver was not knowing, intelligent, or voluntary. *Id.*

¶ 37    "A motion to suppress presents a mixed question of law and fact." *People v. Ellison*, 2013 IL App (1st) 101261, ¶ 29 (citing *People v. Gherna*, 203 Ill. 2d 165, 175 (2003)). The trial court's factual determinations will be upheld unless they are against the manifest weight of the evidence. *Id.* However, whether the trial court applied the correct legal standard at a suppression hearing represents a question of law this court reviews *de novo. People v. Johnson*, 237 Ill. 2d 81, 88-89 (2010). Defendant does not challenge any of the factual findings of the trial court, only whether the court applied the correct legal standard. We confine our review accordingly.

¶ 38    The hearing transcript demonstrates the trial court correctly placed the burden on the State at the suppression hearing. Defendant's suppression motion alleged the incriminating statement was made as a result of police questioning. In making its ruling, the trial court stated:

> "THE COURT: Okay. Well, that's also my understanding of the *Miranda* ruling. This is about someone who is in custody and interrogated by government or by police authority. In this case the defense presented a motion and the evidentiary portion of this motion there's no evidence whatsoever that that [*sic*] statement made by the defendant

- 9 -

was a result of any questioning by the police or from the police. Based on my understanding of *Miranda*, this was not a custodial standpoint. This was a statement, from the evidence I heard, was made spontaneous by the defense, so the motion will be denied."

The trial court correctly held that it was the State's burden to demonstrate that the statement at issue was not the result of custodial questioning. The court found no questioning occurred and the statement had been spontaneously uttered by defendant during his arrest in the basement. We disagree with defendant's account of the trial court's ruling and find that no burden shifting occurred at the suppression hearing.

¶ 39                                    IV. CONCLUSION

¶ 40        For the foregoing reasons, we affirm the defendant's conviction for first degree murder.

¶ 41        Affirmed.