2019 IL App (1st) 161263-U

SIXTH DIVISION
September 27, 2019
Modified upon denial of rehearing November 1, 2019

No. 1-16-1263

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 4532 (02) |
| | ) | |
| CHRISTOPHER CALVIN, | ) | Honorable |
| | ) | Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justice Cunningham and Justice Connors concurred in the judgment.

**ORDER**

¶ 1     *Held:*  Defendant was not deprived of a fair trial by evidence regarding a license plate number and the interview of a non-testifying codefendant. State did not make improper remarks in argument. Defendant's conviction for aggravated kidnapping is reversed because his asportation of the victim was incidental to armed robbery.

¶ 2     Following a jury trial, defendant Christopher Calvin was convicted of armed robbery with a firearm and aggravated kidnapping and sentenced to concurrent prison terms of 24 and 8 years. Defendant contends on appeal that he was deprived of a fair trial when the State was allowed to elicit testimony implying that a non-testifying codefendant had implicated defendant,

which constituted hearsay and violated defendant's right to confront witnesses against him. He also contends that the State made various improper remarks or arguments. Lastly, he contends that the State failed to prove him guilty of aggravated kidnapping beyond a reasonable doubt where it failed to show his intent to secretly confine the victim and where his asportation of the victim was merely incidental to the armed robbery. For the reasons stated below, we reverse defendant's aggravated kidnapping conviction and otherwise affirm.

¶ 3                                     I. JURISDICTION

¶ 4       On December 7, 2015, a jury found defendant guilty of armed robbery with a firearm and aggravated kidnapping. The court sentenced defendant to concurrent prison terms of 24 and 8 years on February 24, 2016, and defendant filed his notice of appeal that day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. July 1, 2017) governing appeals from a final judgment of conviction in a criminal case.

¶ 5                                     II. BACKGROUND

¶ 6       Defendant and codefendants Courtney Thomas and Victor Short were charged in relevant part with armed robbery with a firearm and aggravated kidnapping, allegedly committed against O.J. Yarbor on or about February 20, 2014. The aggravated kidnapping charge alleged that defendants carried Yarbor from one place to another with the intent to secretly confine him against his will, and that they committed aggravated battery against Yarbor.

¶ 7                                     A. Pretrial

¶ 8       Defendant filed a motion *in limine* seeking in relevant part to bar the State from eliciting testimony regarding any statements by Thomas, arguing that such evidence would constitute hearsay and violate defendant's confrontation right. In arguments on the motion, the State told

the court that it did not plan to elicit the substance of Thomas's statements but would elicit that the police interviewed Thomas about the Yarbor robbery and the next step in the police investigation was to pursue defendant and Short. The court denied the motion *in limine*, finding that it was not hearsay for the State to elicit that Thomas was interviewed and the police then sought defendant and Short, so long as the content of Thomas's statements was not elicited.

¶ 9                                                    B. Trial

¶ 10    Defendant and Short were tried by the same jury, and Thomas was not tried with them.

¶ 11    In the State's opening statement, a prosecutor set forth at length the State's version of events during and after the alleged offenses. In relevant part, she said that Thomas went to the police station with his grandmother after the robbery. "They talk to Courtney Thomas about the armed robbery. Next thing the detective does in his investigation, he gets the names of these two individuals, [defendant and Short,] and he puts them in a photo spread" that was then shown to Yarbor. Neither defense counsel objected.

¶ 12                                                 1. State's Case

¶ 13    O.J. Yarbor testified that he owned a tax preparation firm and was working there at about 2 p.m. on February 20, 2014, when a man with dreadlocked hair came in and asked "if this was a tax office." When one of Yarbor's clients said that it was, the man replied that he would be back, and he left. There were about ten people in the office at the time. About a half-hour later, most of them had left the office, though two clients – Vanessa Brown and Brittany Cousins – and a toddler were still there. Yarbor was seated at his desk when two men entered the office brandishing pistols. One man was the dreadlocked man who had briefly entered the office at about 2 p.m., and the other had short hair. The former had a semiautomatic 9-millimeter pistol and the latter had a chrome .38-caliber revolver. Yarbor was familiar with guns, including

owning guns himself, and the firearms held by the two men appeared to be metal rather than plastic. Yarbor had never seen either man before that day.

¶ 14    The short-haired man ordered Yarbor at gunpoint to tell him where the safe was. Yarbor at first refused to stand, but the man forced Yarbor to take him to a back room where the safe was located.[1] The man then ordered Yarbor to open the safe. When Yarbor did not open the safe quickly enough for the man's taste, the man struck Yarbor on the head with his gun. The blow was extremely painful because the metal gun was heavy, which reinforced Yarbor's belief that it was an actual firearm. Yarbor eventually opened the safe and handed the man the money inside, about $5000. Yarbor also kept debit cards belonging to clients in the safe, and the short-haired man grabbed those cards from the safe over Yarbor's protest. The man demanded to know where "the rest of the money" was and threatened to shoot Yarbor.

¶ 15    The dreadlocked man came to the door of the back room, and the short-haired man asked the dreadlocked man if he should shoot Yarbor. While Yarbor could not recall exactly what the dreadlocked man said, the gist was that he should not shoot Yarbor. While in the back room, the dreadlocked man took a computer tablet that was on the desk there. The two men then left the office. Yarbor followed them to the exit, a few feet behind them so they would not notice. He saw the two men enter a car that just drove up, and he noted the license plate number as the car drove away. Yarbor then called the police, and he gave them the plate number.

¶ 16    Two days after the robbery, on February 22, police came to Yarbor's office and showed him two arrays of photographs. From one array, he identified a photograph as depicting the short-haired robber. From the other array, Yarbor identified a photograph as depicting the dreadlocked robber. At trial, he identified defendant as the short-haired man and Short as the

_____

[1] While this room was referred to at times as Yarbor's office, we shall refer to it as the back room to distinguish it from the office of Yarbor's firm as a whole.

dreadlocked man. Later on the 22nd, Yarbor went to the police station and viewed a lineup, from which he identified defendant and Short as the two robbers.

¶ 17    On cross-examination, Yarbor testified that he wears glasses for reading but does not need them to see at a distance. He did not know exactly how much money was in the safe when the robbers took it, as he "had taken small amounts out throughout the day" and did not keep records of his deposits or withdrawals as the money was his rather than his clients' funds. He told the responding officers that it was between $4000 and $5000. The clients' debit cards in the safe had not been activated. Yarbor testified that three tablets were taken in the robbery but he mentioned only two to police. The robbery took about 5 to 10 minutes. No photographs were taken of Yarbor's head, and he received no medical treatment.

¶ 18    Brittany Cousins testified that she was in Yarbor's office on the afternoon in question, discussing her taxes with him. At one point, a man entered and asked if this was the "tax place." Cousins replied that it was, and the man left. Several minutes later, shortly after many people left the office, two men robbed the office. One had short hair and the other had dreadlocks, and both were holding guns. The short-haired man walked directly to Yarbor, while the dreadlocked man stayed with Cousins, her child, and another customer. The dreadlocked man "wasn't really doing anything" but holding his gun, and as Cousins calmed her crying child, he said that he was not going to shoot them. Cousins heard the short-haired man ask Yarbor where the money and cards were, then heard a thump and Yarbor exclaiming that he had been struck on the head. The dreadlocked man did not do anything as he stood near Cousins, until he and the other man grabbed tablets and left the office. After the men ran out, Yarbor followed them. When he came back inside, he wrote down a license plate number and called the police. Cousins viewed a lineup

two days after the incident, but she made no identification as she was paying attention to her child during the incident. Yarbor was not in the room when she viewed the lineup.

¶ 19    On cross-examination, Cousins testified that the man who entered the office before the incident did not have dreadlocked hair, and she was unsure whether that man was one of the two robbers. While she heard a thump and Yarbor's exclamation that he had been struck, she did not hear anyone threaten to shoot Yarbor. The room where the man took Yarbor had no windows, but the door to the rest of the office was open. She believed the robbery took about 10 to 15 minutes. When she told Yarbor that she had not identified anyone in the lineup, he seemed "a little aggravated" and urged her to "pick somebody."

¶ 20    Vanessa Brown testified that she was in Yarbor's office at about 2:30 p.m. on the day in question when two men entered with guns, one with short hair and the other with dreadlocks. The short-haired man told Yarbor to "get up and give us the money," then led Yarbor into another room in the office, where he struck Yarbor with his gun as he again demanded money. The dreadlocked man stayed with Vanessa, Cousins, and her child. At some point, he opened a white box and took something from it. The two men then left the office, followed by Yarbor. The police came to the office a short time later, and Vanessa spoke with them. However, Vanessa never went to the police station any time in 2014 to view a lineup or the like. Pursuant to a subpoena, Vanessa told this assistant State's Attorney (ASA) – that is, the prosecutor at trial – in September 2015 that she could not make an identification. Vanessa went to the police station in November 2015 "when I was told to go," walking there herself. She viewed two photographic arrays, from which she identified one photograph as depicting the short-haired man who struck Yarbor and another as the dreadlocked man who stayed with her during the incident. At trial,

Vanessa identified defendant as the former and Short as the latter. She did not know either man before the incident.

¶ 21    On cross-examination, Vanessa clarified that she did not see anyone strike Yarbor, nor did she hear anyone threaten to shoot him. She "never said she couldn't" identify anyone. Defendant elicited again from Vanessa that this ASA interviewed her in September 2015. Vanessa recalled calling somebody some time before November 2015 to report that she could make an identification.

¶ 22    Police officer Mark Campbell testified that he responded to a reported robbery at Yarbor's office. He spoke with Yarbor, who described the getaway car as a Kia and gave him a license plate number. He "ran that number" in the police computer, learning that the plate was registered to a Kia, and he gave the plate number over police radio as connected to a recent robbery. The court admonished the jury that the testimony regarding the plate number was offered to show what the police did and why, "not for the accuracy of the information." On cross-examination, Campbell testified that his report reflected that Yarbor mentioned the dreadlocked man threatening to shoot the women, and it did not reflect Yarbor mentioning the short-haired man threatening to shoot him.

¶ 23    Police detective Joseph Gentile testified that he investigated the Yarbor robbery and received a license plate number from Officer Campbell. Records showed that plate as registered to a Kia owned by a woman named Chandler, so Gentile sent officers to Chandler's address to speak with her. Chandler came to the police station on February 22 with codefendant Thomas. After Gentile interviewed Chandler, including asking her who was driving her Kia on February 20 between 2 and 3 p.m., she left the police station. Gentile then interviewed Thomas, after which Gentile focused his investigation upon defendant and Short. Gentile prepared two

photographic arrays, one consisting of photographs of defendant and persons with "similar demographics" according to the police computer, and the other consisting of photographs of Short and similar persons. Gentile had other officers show the arrays to witnesses. When he later learned that identifications were made from the arrays, he had officers arrest defendant and Short. Vanessa Brown did not view the arrays or any lineup in 2014 but viewed arrays in November 2015. While Gentile prepared those arrays, another officer showed them to her.

¶ 24    On cross-examination, Gentile testified that a single lineup, including both defendant and Short, was composed on February 22. However, police procedure encouraged having lineup participants who resembled the suspect and discouraged having two suspects in the same lineup. Gentile explained that he could not find enough "fillers" or random similar persons in the police station for two lineups, and he found it "very difficult to get somebody off the street" as a filler. Defendant and Short stood next to each other in the lineup, and Gentile testified that lineup participants are allowed to "sit wherever they want, and that's where they chose to sit."

¶ 25    The parties stipulated that five fingerprints were found on a tablet box in Yarbor's office, none of which matched any defendant and two of which matched Yarbor.

¶ 26                                    2. Mid-Trial Rulings

¶ 27    Before the State rested, defendants sought to bar Chandler from testifying and to strike the testimony of Officer Campbell and Detective Gentile regarding the license plate number, arguing that it could not come in as substantive evidence because Yarbor did not testify to the actual license plate number he saw and gave to Officer Campbell. The State argued that Yarbor gave police the number in the heat of the moment just after the robbery so it had indicia of reliability and should not be barred as hearsay. The court granted the defense motions, striking

testimony related to the plate number itself – but not general discussion of using a plate number in the police investigation – and barring Chandler as a witness.

¶ 28    Defendants moved for mistrial, arguing that the jury heard the license plate evidence. The court denied a mistrial, noting that it was proper for Yarbor to testify that he provided police a plate number and for the police to testify that they took certain actions as a result "as long as you don't argue the fact about a license plate number being probative of *** guilt or innocence."

¶ 29    The court admonished the jury that it heard testimony "about a particular license plate number" and "are to disregard that number" and "not to consider the fact of that number in your deliberations."

¶ 30                              3. Defense Case

¶ 31    Theresa Brown testified that she went to a sick neighbor's apartment at about 2 p.m. on February 20, 2014, to check on him. Defendant was the sick man's nephew and also lived in the apartment, and he was there sitting on the sofa watching television when she came. When she stopped by about every 20 minutes to check on the sick neighbor, defendant was still there. On cross-examination, she admitted to being a friend of defendant and testified that she went to defendant's apartment daily to care for his sick uncle until he died.

¶ 32    Defendant testified that he was home, in the apartment he shared with his aunt and uncle, between 2 and 3 p.m. on February 20, 2014. Theresa Brown visited his apartment during that time. Defendant considered her to be a friend of the family, and she frequently came to his home to take care of his uncle. Defendant was arrested at home on February 22 for a misdemeanor cannabis offense. He had seen codefendant Short in the neighborhood but did not know him. Defendant lived at another address before living with his aunt and uncle, and he denied living at two addresses simultaneously.

¶ 33    The parties stipulated that defendant was arrested for misdemeanor possession of cannabis on February 22, 2014, at the apartment he shared with his aunt and uncle, but his identification card showed the other address.

¶ 34    Codefendant Short presented an alibi witness.

¶ 35                                    4. Instructions, Etc.

¶ 36    Defendants unsuccessfully moved for directed verdicts, without argument.

¶ 37    Defendants challenged the jury instruction on circumstantial evidence, arguing that "certain hearsay evidence *** was brought in improperly" without a proper foundation. The court overruled, finding "there's some evidence of circumstantial evidence, not a great deal."

¶ 38    The jury was instructed on armed robbery with a firearm and on aggravated kidnapping. For purposes of the latter charge, where the alleged aggravation was that defendants committed aggravated battery against Yarbor, the instructions defined aggravated battery as insulting or provoking contact while using a dangerous weapon other than discharging a firearm. The jury was instructed before and after closing arguments that arguments are not evidence and arguments not supported by evidence or reasonable inferences from the evidence should be disregarded.

¶ 39    In its main closing argument, the State set forth its version of events. After describing the robbery and events preceding the robbery, the State argued that defendant and codefendant Short left Yarbor's office, then Yarbor followed them to "a waiting vehicle which neither of these two men went into the driver's seat." Yarbor "got their license plate from the vehicle. He came right back inside and called the police. He gave them the license plate number. The police ran that license plate number, and it comes back to a registered owner. The registered owner had a young man, went to speak with the police. *** After speaking with the woman and the young man, the

police went out looking for these two defendants." Yarbor then identified defendant and Short, and Vanessa Brown later identified them as well.

¶ 40    There were no defense objections during the State's main argument.

¶ 41    Defendant's counsel argued that defendant was arrested at home for a minor offense, that he did not know Short, that he would not have stood next to Short in the lineup if he had committed a crime with him, and that defendant's alibi from Theresa Brown cast doubt on Yarbor's identifications. Counsel also argued that Yarbor's identifications and other testimony were unreliable because he wore glasses, did not keep records of large amounts of cash, and told police that two tablets were taken but testified that three were stolen. Counsel noted that Yarbor mentioned Short threatening Cousins and Vanessa Brown but neither testified to being threatened. Counsel argued that the lineup was not conducted according to proper procedure, including conducting a separate lineup for each suspect. Counsel noted that Cousins made no identification and that no fingerprint or other forensic evidence linked defendant to the robbery. Counsel noted that Vanessa Brown made no identification until long after the robbery, after telling the ASA that she could not make an identification, and argued that Vanessa did not go to the police station in November 2015 voluntarily and felt "threatened." Counsel argued that Yarbor was robbed but not kidnapped, because he was not secretly confined.

¶ 42    In rebuttal, the State argued that defendant and Short were on trial rather than Yarbor. Yarbor was "a hero, because he was able to compose himself enough to write down that license plate number that leads right to these two defendants." (No objection was made to this argument.) The discrepancies in Yarbor's accounts, and the deviations from police procedure in the lineup, were not impeaching. Moreover, Yarbor's identifications were corroborated by Vanessa Brown. The State characterized the argument that Vanessa's testimony was not reliable

as the ASA "going to go out on a conspiracy," argued that the ASA was not "threatening her with throwing her in the jail" merely by subpoenaing her, and noted that Vanessa came to the police station rather than being brought there. (No objection was made to this argument.) The State argued that Yarbor and Vanessa were "held hostage" by defendant and Short to "not forget their faces." The State noted that, while Theresa Brown testified that defendant was home during the robbery, she also testified that she went to defendant's home daily to care for his uncle.

¶ 43    Following deliberations, the jury found both defendant and Short guilty of armed robbery with a firearm and aggravated kidnapping.

¶ 44                                          C. Posttrial

¶ 45    Defendant filed a general posttrial motion claiming that the State failed to convict him beyond a reasonable doubt and that he was denied due process and a fair trial without specifics. Before sentencing, defendant filed an amended posttrial motion, adding various claims including (1) improper opening statements referring to inadmissible evidence and witnesses regarding the license plate number, (2) error in allowing hearsay evidence regarding the plate number, (3) error in denying the mistrial motion regarding the license plate evidence, and (4) improper State closing arguments (a) referring to "facts not in evidence and facts stricken from the record" including "who the license plate came back to, when that was stricken," (b) "burden shifting regarding defense alibi witness," and (c) "improperly arguing character evidence of witness Brown, referring to her as a 'hard working woman cleaning at Navy Pier,' and 'not robbing/terrorizing people.' "

¶ 46    At the hearing on defendant and Short's posttrial motions, defendant's counsel stood on the amended motion, and the court denied the motions without significant comment.

¶ 47    Following a sentencing hearing, the court sentenced defendant to concurrent prison terms of 24 years. Defendant's postsentencing motion was granted insofar as the sentence for aggravated kidnapping was reduced to eight years because a firearm enhancement applied to armed robbery, but not aggravated kidnapping, as charged. Defendant timely filed this appeal.[2]

¶ 48                                                    III. ANALYSIS

¶ 49                                                    A. Hearsay

¶ 50    Defendant first contends that he was deprived of a fair trial when the State was allowed to elicit testimony implying that codefendant Thomas had implicated defendant, which constituted hearsay and violated defendant's right to confront witnesses against him. The State responds that defendant forfeited such a claim, and that trial counsel was not ineffective for not preserving the claim because the testimony at issue was proper.

¶ 51    Hearsay – "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" – is generally inadmissible, with various exceptions. Ill. Rs. Evid. 801(c) (eff. Oct. 15, 2015), 802 (eff. Jan. 1, 2011). Conversely, an out-of-court statement is not hearsay if it is offered for some purpose other than to establish the truth of the matter asserted. *People v. Hanson*, 238 Ill. 2d 74, 102 (2010). The constitutional right to confront witnesses against oneself is not implicated by a testimonial out-of-court statement offered for a purpose other than establishing the truth of the matter asserted. *People v. Darr*, 2018 IL App (3d) 150562, ¶ 67 (citing *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004)). Thus, a police officer may testify regarding the steps taken in an investigation of a crime when such testimony is necessary to fully explain the State's case, though such testimony shall not include the substance of any conversation with a person who is

_____

[2] Short was sentenced to concurrent prison terms of 21 years, with aggravated kidnapping reduced to 8 years upon his postsentencing motion. Short's appeal is proceeding separately. *People v. Short*, No. 1-16-2168.

not testifying. *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 18. An "officer's testimony recounting steps taken in the course of an investigation may be admissible without violating a defendant's confrontation rights, even though the officer's description of the progress of the case might suggest that nontestifying witnesses implicated the defendant." *People v. Johnson*, 116 Ill. 2d 13, 24 (1987).

¶ 52    Evidentiary rulings, including whether to grant a motion *in limine*, are generally within the trial court's sound discretion and not reversed absent an abuse of discretion. *People v. Way*, 2017 IL 120023, ¶ 18; *People v. Reese*, 2017 IL 120011, ¶ 75. A court abuses its discretion when its ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the court's view. *People v. Peterson*, 2017 IL 120331, ¶ 125. The admission of hearsay evidence is harmless error if there is no reasonable probability that the trier of fact would have acquitted the defendant absent the hearsay testimony. *Matthews*, 2017 IL App (4th) 150911, ¶ 23.

¶ 53    Here, as a threshold matter, we note that defendant raised hearsay issues regarding the license plate evidence and Thomas's statement in his motion *in limine*, and reiterated such claims in his posttrial motion as amended. Our supreme court has held that, in a criminal case, an issue raised in a hearing *in limine* and the posttrial motion is properly preserved and not forfeited. *People v. Denson*, 2014 IL 116231.

¶ 54    Here, Officer Campbell and Detective Gentile testified strictly to the course of their investigation that led to defendant and codefendant Short. Yarbor provided Campbell a license plate number shortly after the robbery. Campbell provided a plate number to Gentile, who found that the plate was for a Kia registered to Chandler, and asked officers to speak with Chandler. Chandler later came to the police station with codefendant Thomas. After speaking with Chandler, Gentile spoke with Thomas. After speaking with Thomas, Gentile investigated

defendant and Short. Consistent with the hearing *in limine*, the State never elicited the content of Thomas's conversation with Gentile, and nobody testified to such content.

¶ 55    Defendant argues that this testimony implies that Thomas implicated defendant and Short. However, this court has held that an officer's testimony was not hearsay when it was "correctly limited to the investigatory steps he took leading up to the identification of defendant and demonstrated defendant's arrest was not purely coincidental" and the officer did not testify to the substance of any statement by a non-testifying person. *People v. Davison*, 2019 IL App (1st) 161094, ¶¶ 32-34. As we said in *Davison*, "[w]hile the implication of his testimony is that [a non-testifying person] provided the names of [the] defendant and two others as individuals connected to [a] murder, this implication does not render the testimony hearsay or inadmissible." *Id.* ¶ 32 (citing *Johnson*, 116 Ill. 2d at 24). Similarly, while Detective Gentile's testimony implies that Thomas implicated defendant and Short in the armed robbery of Yarbor, that implication does not render the testimony hearsay or inadmissible as nobody testified to the content of any statement by or interview with Thomas. We conclude that the testimony regarding the license plate number and Thomas's interview was not inadmissible or improper.

¶ 56                                    B. Improper State Remarks

¶ 57    Defendant also contends that the State made improper remarks or arguments. He argues that the State improperly encouraged the jury to consider the evidence regarding the license plate and the police questioning of codefendant Thomas as substantive evidence against defendant. He also argues that the State vouched for Vanessa Brown's credibility, including a prosecutor effectively presenting testimony. The State responds that the remarks and arguments were proper

¶ 58    Prosecutors are afforded wide latitude in closing argument and may properly comment on the evidence presented or reasonable inferences drawn from that evidence, may respond to

comments by defense counsel that invite response, and may comment on the credibility of witnesses. *People v. Kallal*, 2019 IL App (4th) 180099, ¶ 35; *People v. Olla*, 2018 IL App (2d) 160118, ¶¶ 40-41. A prosecutor is not allowed to misstate the evidence, argue facts not in evidence, or attempt to shift the burden of proof to the defense. *Olla*, 2018 IL App (2d) 160118, ¶ 41; *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47. It is improper for a prosecutor to make remarks with the sole effect of inflaming the jury's passions or develop its prejudices without casting any light on the issues. *People v. Darr*, 2018 IL App (3d) 150562, ¶ 71. Conversely, commentary that inflames the jury's passions is not improper if it also serves a proper purpose. *Id*.

¶ 59    The trial court can cure erroneous statements made during arguments by giving proper jury instructions on the law, reminding the jury that arguments are not evidence and should be disregarded if unsupported by the evidence, or by sustaining an objection and instructing the jury to disregard the improper statement. *Kallal*, 2019 IL App (4th) 180099, ¶ 35.

¶ 60    Our review considers closing arguments in their entirety and considers remarks in context, and improper remarks do not merit reversal unless they cause substantial prejudice to the defendant. *Id*. Substantial prejudice exists when the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the conviction. *Id.* The strength of the evidence against the defendant is often a decisive factor in this determination. *Marzonie*, 2018 IL App (4th) 160107, ¶ 48.

¶ 61    Here, as a threshold matter, we note that defendant did not object to the State's remarks regarding either the license plate number and Thomas evidence or Vanessa Brown. Also, defendant's posttrial motion as amended did not mention his claims of improper argument

regarding Vanessa, though it did raise claims of improper argument regarding the license plate and Thomas. A claim is forfeited unless a contemporaneous objection was made and a written posttrial motion raised the issue. *Reese*, 2017 IL 120011, ¶ 68. Forfeiture may be set aside under the plain-error doctrine, under which we consider a clear or obvious error if either (1) the trial evidence was closely balanced or (2) the error was so egregious as to deny the defendant a fair trial. *Id*. ¶ 69. A defendant claiming plain error has the burden of showing plain error, and the first step in plain-error analysis is determining whether an error occurred at all. *Id*.

¶ 62    Examining the State's remarks in context, we do not find them improper. In the State's main argument, the course of the investigation was described without the State arguing any implications from that course. In rebuttal argument, the State argued that the license plate number led to defendant and Short but did not mention Thomas's statement. As to Vanessa, the trial evidence showed that the prosecuting ASA interviewed her pursuant to subpoena, at which time Vanessa said she could not make an identification, but then Vanessa contacted the authorities to report that she could make an identification. Defendant argued in closing that Vanessa was threatened or intimidated into her identifications by the State, and the State's argument at issue was made in response to the defense argument.

¶ 63    Moreover, we do not find the evidence of defendant's guilt to be closely balanced, so that any error arising from the closing arguments was not plain error. Yarbor, Cousins, and Vanessa Brown gave a generally consistent account of the robbery: a short-haired robber and a dreadlocked robber each entered Yarbor's office with a firearm, the short-haired robber forced Yarbor into the back room while the dreadlocked robber stayed with Cousins and Vanessa, Cousins and Vanessa heard a strike and exclamation corresponding to Yarbor's testimony that defendant struck him, and Vanessa corroborated Yarbor's testimony that at least one tablet was

stolen. Yarbor and Vanessa each made multiple identifications of defendant and Short as the robbers, before and during trial, and each viewed different photographic arrays several months apart. Vanessa was notably not the victim of the armed robbery; it was Yarbor's office that was invaded at gunpoint, and it was not Vanessa's property that was stolen. As to her identifications made over a year after the robbery, we do not consider them impeached by the fact that she cooperated with authorities after the day of the robbery only after being subpoenaed; that does not by itself render her account or identifications the result of threats or intimidation. Vanessa's testimony taken as a whole does not strike us as reluctant, hesitant, or uncooperative.

¶ 64                                C. Aggravated Kidnapping

¶ 65    Lastly, defendant contends that the State failed to prove him guilty of aggravated kidnapping beyond a reasonable doubt where it failed to show his intent to secretly confine Yarbor and where his asportation of Yarbor was merely incidental to the armed robbery. The State responds that the evidence was sufficient to convict defendant of aggravated kidnapping.

¶ 66    A person commits aggravated kidnapping when he commits kidnapping and inflicts great bodily harm, or commits another felony, upon the kidnapping victim. 720 ILCS 5/10-2(a)(3) (West 2014). A person commits kidnapping when he knowingly "by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will" (720 ILCS 5/10-1(a)(2) (West 2014)), which is referred to as asportation. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009). Intent is rarely proven by direct evidence and may properly be inferred from conduct and circumstances. *Peterson*, 2017 IL 120331, ¶ 43. In determining whether an asportation supports an independent offense of kidnapping or is merely ancillary to another offense, we consider (1) the duration of the asportation, (2) whether the asportation occurred during the commission of a separate offense, (3) whether the asportation

is inherent in the separate offense, and (4) whether the asportation created a significant danger to the victim independent of the separate offense. *Siguenza-Brito*, 235 Ill. 2d at 225-26. Our analysis is particular to the facts and circumstances of the case before us. *People v. Sumler*, 2015 IL App (1st) 123381, ¶ 56. Whether a kidnapping or aggravated kidnapping conviction should be reversed on the grounds that the asportation was incidental to another crime is a question of the sufficiency of the evidence, not a question of law reviewed *de novo*. *Id.* ¶ 53.

¶ 67 On a claim of insufficient evidence, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the testimony and other evidence, and the trier of fact is better equipped than this court to do so as it heard the evidence. *Id.; In re Jonathon C.B.*, 2011 IL 107750, ¶ 59. Thus, we do not retry a defendant. *Harris*, 2018 IL 121932, ¶ 26. The trier of fact is not required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. Stated another way, the State need not disprove or rule out all possible factual scenarios at trial. *Id.* ¶ 27. The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Id.*; *Jonathon C.B.*, 2011 IL 107750, ¶ 60. A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Harris*, 2018 IL 121932, ¶ 26.

¶ 68 Here, even taking the evidence in the light most favorable to the State as we must, we find that the asportation of Yarbor to the back room of his office was ancillary to armed robbery

and does not support an independent conviction for aggravated kidnapping. Turning to the first of the relevant factors, duration of the asportation, we find that Yarbor was detained relatively briefly, temporally for a few minutes and functionally for as long as it took defendant to force Yarbor to open the safe and yield the property inside. As to whether the asportation occurred during the commission of a separate offense, the answer is clearly "yes." Defendant forced Yarbor into the back room of his office at gunpoint after demanding to know where the safe was, and Yarbor was left alone once defendant had what he came for from the safe.

¶ 69    As to whether the asportation here was inherent in the separate offense, while armed robbery in the abstract does not require taking the victim elsewhere, defendant took Yarbor into the back room at gunpoint to obtain the contents of his safe; that is, to rob him. Lastly, as to whether the asportation created a significant danger to Yarbor independent of the separate offense, we conclude that it did not. Yarbor indeed faced greater danger than the other people in his office watched over by codefendant Short, as shown by the blow to his head and defendant's contemplation of shooting him. However, that greater danger arose from Yarbor being proprietor of the tax firm and owner of the safe in his office, not because defendant led him into the back room. In other words, due to defendant and Short being armed, Yarbor would have been effectively just as far beyond the help of Cousins or Vanessa Brown if he had been in the front room of his office as he actually was in the back room with defendant.

¶ 70                                    IV. CONCLUSION

¶ 71    Accordingly, we reverse defendant's aggravated kidnapping conviction. We otherwise affirm the judgment of the circuit court

¶ 72    Reversed in part and affirmed in part.