# Illinois Official Reports

## Appellate Court

---

### *People v. Short*, 2020 IL App (1st) 162168

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR SHORT, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-16-2168 |
| Filed | January 24, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-4532(03); the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Manuela Hernandez, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Koula A. Fournier, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Mikva and Justice Cunningham concurred in the judgment and opinion. |

## OPINION

¶ 1      Following a jury trial, defendant, Victor Short, was convicted of armed robbery with a firearm and aggravated kidnapping and sentenced to concurrent prison terms of 21 and 8 years. Defendant contends on appeal that the evidence was insufficient to convict him beyond a reasonable doubt, that the trial court erred in denying his pretrial motion to suppress identification, and that the State made improper remarks or arguments. He also contends that he was deprived of a fair trial when the State was allowed to elicit testimony implying that a nontestifying codefendant had implicated defendant, which constituted hearsay and violated defendant's right to confront witnesses against him. He contends that trial counsel rendered ineffective assistance. Lastly, he contends that the State failed to prove him guilty of aggravated kidnapping beyond a reasonable doubt when the asportation of the victim was incidental to the armed robbery. For the reasons stated below, we reverse defendant's aggravated kidnapping conviction and otherwise affirm.

¶ 2      I. JURISDICTION

¶ 3      On December 7, 2015, a jury found defendant guilty of armed robbery with a firearm and aggravated kidnapping. The court sentenced defendant to concurrent prison terms of 21 years and 8 years on February 24, 2016. This court granted defendant leave to file a late notice of appeal on August 25, 2016, and defendant filed his notice of appeal the next day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606(c) (eff. July 1, 2017) governing appeals from a final judgment of conviction in a criminal case.

¶ 4      Specifically, defendant filed a *pro se* motion for leave to file a late notice of appeal in August 2016, explaining why he did not file a notice of appeal earlier. He therefore complied with Rule 606(c), allowing this court to grant such leave upon a motion "filed in the reviewing court within six months of the expiration of the time for filing the notice of appeal," showing "that the failure to file a notice of appeal on time was not due to appellant's culpable negligence." Ill. S. Ct. R. 606(c) (eff. July 1, 2017).

¶ 5      II. BACKGROUND

¶ 6      Defendant and codefendants, Christopher Calvin and Courtney Thomas, were charged in relevant part with armed robbery with a firearm and aggravated kidnapping, allegedly committed against O.J. Yarbor on or about February 20, 2014. The aggravated kidnapping charge alleged that defendants carried Yarbor from one place to another with the intent to secretly confine him against his will and that they committed aggravated battery against Yarbor.

¶ 7      A. Motion to Suppress

¶ 8      Defendant filed a motion to suppress pretrial identification, arguing that Yarbor described one of the offenders as having long dreadlocked hair but the array of five photographs shown to Yarbor included only two men who "even had dreadlocks at all" so that the array was unduly suggestive. Defendant also argued that the State did not disclose the circumstances surrounding

the array identification, including who was present when Yarbor was shown the array. At the motion hearing, defendant's opening argument was that the array and subsequent lineup were both unduly suggestive.

¶ 9 Police detective Joseph Gentile testified that he investigated the robbery of Yarbor, during which he conducted a lineup. In conducting lineups, he would "offer the subject the opportunity to pick which position he or she would like to be placed in the lineup." Fillers in the lineup are supposed to be of similar appearance to the subject and are selected from arrested persons at the police station where the lineup is occurring and nearby police stations or "very seldom" from persons on the street. The description of the offenders here was of two young adult men, one with short hair and the other with dreadlocks. Gentile "tried" to find fillers with dreadlocks but only three of the five participants had dreadlocked hair. However, to make the lineup "even or fair," the lineup participants all wore white caps.

¶ 10 Two days after the alleged offenses, and before defendant was arrested, Detective Gentile conducted two photographic arrays, one of which included defendant. The fillers in defendant's array were not the same as the fillers in the lineup. Gentile identified the array he created and showed to Yarbor that included defendant; it depicts two men with long dreadlocks, two with shorter dreadlock-like hair, and one with short-cropped hair. Gentile testified that only he and Yarbor were present for the showing of the array.

¶ 11 On cross-examination, Detective Gentile testified that he received a description of the offenders from Yarbor, and other witnesses corroborated his description. Gentile selected the fillers for the array using a computer program that searches police records for persons with similar demographics to the subject. Before showing Yarbor the array, he had Yarbor sign a waiver disclosing that the suspect may or may not be in the array, advising Yarbor not to presume that the person conducting the lineup knew who the suspect was, and notifying Yarbor that he was not required to make an identification. After Yarbor selected defendant's photograph without "any difficulty," defendant was arrested and placed in a lineup on the same day. Gentile selected the lineup fillers from among persons in police custody at various police stations. Gentile took into consideration defendant's dreadlocks, and he placed all participants in white caps because not all the fillers were dreadlocked. All participants were men of the same race and skin complexion. Defendant was able to choose where he stood in the lineup. During the lineup, Gentile was with the participants and another detective was with Yarbor. Immediately after the lineup, that detective told Gentile that Yarbor selected defendant and Calvin from the lineup.

¶ 12 On redirect examination, Detective Gentile testified that the braids of two of the lineup participants, including defendant, were visible despite the white caps.

¶ 13 Following arguments, the court denied the motion to suppress. The court found that multiple fillers in the array had dreadlocks or similar hairstyles. Noting that the lineup participants all wore caps and that defendant had the longest dreadlocks in the lineup, the court found that "I don't see what else the police could have done."

¶ 14 B. Motion *in Limine*

¶ 15 Calvin filed, and defendant joined, a motion *in limine* seeking in relevant part to bar the State from eliciting testimony regarding any statements by Thomas, arguing that such evidence would constitute hearsay and violate their confrontation right. In arguments on the motion, the State told the court that it did not plan to elicit the substance of Thomas's statements but would

elicit that the police interviewed Thomas about the Yarbor robbery and the next step in the police investigation was to pursue defendant and Calvin. The court denied the motion *in limine*, finding that it was not hearsay for the State to elicit that Thomas was interviewed and the police then sought defendant and Calvin so long as the content of Thomas's statements was not elicited.

¶ 16                                                    C. Trial

¶ 17         Defendant and Calvin were tried by the same jury, and Thomas was not tried with them.

¶ 18         In the State's opening statement, a prosecutor set forth at length the State's version of events during and after the alleged offenses. In relevant part, she said that Thomas went to the police station with his grandmother after the robbery. "They talk to Courtney Thomas about the armed robbery. Next thing the detective does in his investigation, he gets the names of these two individuals, [defendant and Calvin,] and he puts them in a photo spread" that was then shown to Yarbor. Neither defense counsel objected.

¶ 19                                              1. State's Case

¶ 20         Yarbor testified that he owned a tax preparation firm and was working there at about 2 p.m. on February 20, 2014, when a man with dreadlocked hair came in and asked "if this was a tax office." When one of Yarbor's clients said that it was, the man replied that he would be back, and he left. There were about 10 people in the office at the time. About a half-hour later, most of them had left the office, though two clients—Vanessa Brown (Vanessa) and Brittany Cousins—and a toddler were still there. Yarbor was seated at his desk when two men entered the office brandishing pistols. One man was the dreadlocked man who had briefly entered the office at about 2 p.m., and the other had short hair. The former had a semiautomatic 9-millimeter pistol, and the latter had a chrome .38-caliber revolver. Yarbor was familiar with guns, including owning guns himself, and the firearms held by the two men appeared to be metal rather than plastic. Yarbor had never seen either man before that day.

¶ 21         The short-haired man ordered Yarbor at gunpoint to tell him where the safe was located. Yarbor at first refused to stand, but the man forced Yarbor to take him to a back room where the safe was located.[1] The man then ordered Yarbor to open the safe. When Yarbor did not open the safe quickly enough for the man's taste, the man struck Yarbor on the head with his gun. The blow was extremely painful because the metal gun was heavy, which reinforced Yarbor's belief that it was an actual firearm. Yarbor eventually opened the safe and handed the man the money inside, about $5000. Yarbor also kept debit cards belonging to clients in the safe, and the short-haired man grabbed those cards from the safe over Yarbor's protest. The man demanded to know where "the rest of the money" was and threatened to shoot Yarbor.

¶ 22         The dreadlocked man came to the door of the back room, and the short-haired man asked the dreadlocked man if he should shoot Yarbor. While Yarbor could not recall exactly what the dreadlocked man said, the gist was that he should not shoot Yarbor. While in the back room, the dreadlocked man took a computer tablet that was on a desk. The two men then left the office. Yarbor followed them to the exit, a few feet behind them so they would not notice.

---

[1]While this room was referred to at times as Yarbor's office, we shall refer to it as the back room to distinguish it from the office of Yarbor's firm as a whole.

He saw the two men enter a car that just drove up, and he noted the license plate number as the car drove away. Yarbor then called the police, and he gave them the plate number.

¶ 23    Two days after the robbery, on February 22, police came to Yarbor's office and showed him two arrays of photographs. From one array, he identified a photograph as depicting the short-haired robber. From the other array, Yarbor identified a photograph as depicting the dreadlocked robber. At trial, he identified defendant as the dreadlocked man and Calvin as the short-haired man. Later on February 22, Yarbor went to the police station and viewed a lineup, from which he identified defendant and Calvin as the two robbers.

¶ 24    On cross-examination, Yarbor testified that he wears glasses for reading but does not need them to see at a distance. He saw both robbers' faces, had "a fairly good look at" the dreadlocked robber when he came into the office, and denied identifying defendant only by his dreadlocks. He described the dreadlocked robber as having shoulder-length hair, neither short nor "extremely long." Yarbor did not know exactly how much money was in the safe when the robbers took it, as he "had taken small amounts out throughout the day" and did not keep records of his deposits or withdrawals as the money was his rather than his clients' funds. He told the responding officers that it was between $4000 and $5000. The clients' debit cards in the safe had not been activated. Yarbor testified that three tablets were taken in the robbery, but he mentioned only two to police. The robbery took about 5 to 10 minutes. No photographs were taken of Yarbor's head, and he received no medical treatment. Uniformed officers, not Detective Gentile, showed him the photographic arrays. He denied telling Cousins to "pick some people out" and denied being upset with her when she did not.

¶ 25    Cousins testified that she was in Yarbor's office on the afternoon in question, discussing her taxes with him. At one point, a man entered and asked if this was the "tax place." Cousins replied that it was, and the man left. Several minutes later, shortly after many people left the office, two men robbed the office. One had short hair and the other had dreadlocks, and both were holding guns. The short-haired man walked directly to Yarbor, while the dreadlocked man stayed with Cousins, her child, and another customer. The dreadlocked man "wasn't really doing anything" but holding his gun, and as Cousins calmed her crying child, he said that he was not going to shoot them. Cousins heard the short-haired man ask Yarbor where the money and cards were and then heard a thump and Yarbor exclaiming that he had been struck on the head. The dreadlocked man did not do anything as he stood near Cousins until he and the other man grabbed tablets and left the office. After the men ran out, Yarbor followed them. When he came back inside, he wrote down a license plate number and called the police. Cousins viewed a lineup two days after the incident, but she made no identification as she was paying attention to her child during the incident. Yarbor was not in the room when she viewed the lineup.

¶ 26    On cross-examination, Cousins testified that the man who entered the office before the incident did not have dreadlocked hair, and she was unsure whether that man was one of the two robbers. While she heard a thump and Yarbor's exclamation that he had been struck, she did not hear anyone threaten to shoot Yarbor. The room where the man took Yarbor had no windows, but the door to the rest of the office was open. She believed the robbery took about 10 to 15 minutes. When she told Yarbor that she had not identified anyone in the lineup, he seemed "a little aggravated" and urged her to "pick somebody."

¶ 27    Vanessa testified that she was in Yarbor's office at about 2:30 p.m. on the day in question when two men entered with guns, one with short hair and the other with dreadlocks. The short-

haired man told Yarbor to "get up and give us the money," then led Yarbor into another room in the office, where he struck Yarbor with his gun as he again demanded money. The dreadlocked man stayed with Vanessa, Cousins, and her child. At some point, he opened a white box and took something from it. The two men then left the office, followed by Yarbor. The police came to the office a short time later, and Vanessa spoke with them. However, Vanessa never went to the police station any time in 2014 to view a lineup or the like. Pursuant to a subpoena, Vanessa told the assistant state's attorney (ASA)—that is, the trial prosecutor—in September 2015 that she could not make an identification. Vanessa went to the police station in November 2015 "when I was told to go," walking there herself. She viewed two photographic arrays, from which she identified one photograph as depicting the short-haired man who struck Yarbor and another as the dreadlocked man who stayed with her during the incident. At trial, Vanessa identified Calvin as the former and defendant as the latter. She did not know either man before the incident.

¶ 28     On cross-examination, Vanessa clarified that she did not see anyone strike Yarbor nor did she hear anyone threaten to shoot him. Defendant went briefly into the back room where Yarbor was being held. As Cousin's child was crying, defendant said that he was not going to harm them. Vanessa testified that she "never said she couldn't" identify anyone. When the ASA interviewed her in September 2015, she described the incident. Vanessa recalled calling somebody with the police sometime before November 2015 to report that she could identify the robbers. While she cooperated because she was subpoenaed, she denied that she did not cooperate earlier because she could not make an identification. "I remember their face."

¶ 29     Officer Mark Campbell testified that he responded to a reported robbery at Yarbor's office. He spoke with Yarbor, who described the getaway car as a Kia and gave him a license plate number. He "ran that number" in the police computer, learning that the plate was registered to a Kia, and he gave the plate number over police radio as connected to a recent robbery. The court admonished the jury that the testimony regarding the plate number was offered to show what the police did and why, "not for the accuracy of the information." On cross-examination, Campbell testified that his report reflected that Yarbor mentioned the dreadlocked man threatening to shoot the women and it did not reflect Yarbor mentioning the short-haired man threatening to shoot him.

¶ 30     Detective Gentile testified that he investigated the Yarbor robbery and received a license plate number from Officer Campbell. Records showed that plate as registered to a Kia owned by a woman named Chandler, so Gentile sent officers to her address to speak with her. Chandler came to the police station on February 22 with codefendant Thomas. After Gentile interviewed Chandler, including asking her who was driving her Kia on February 20 between 2 and 3 p.m., she left the police station. Gentile then interviewed Thomas, after which Gentile focused his investigation upon defendant and Calvin. Gentile prepared two photographic arrays, one consisting of photographs of defendant and persons with "similar demographics" according to the police computer and the other consisting of photographs of Calvin and similar persons. Gentile had other officers show the arrays to witnesses. When he later learned that identifications were made from the arrays, he had officers arrest defendant and Calvin. Vanessa did not view the arrays or any lineup in 2014 but viewed arrays in November 2015. While Gentile prepared those arrays, another officer showed them to her. In preparing for trial, Gentile reviewed his reports and realized that he gave mistaken testimony before the grand

jury, "inverting" the roles of defendant and Calvin in the incident including testifying that it was not defendant who briefly entered Yarbor's office before the robbery.

¶ 31 On cross-examination, Detective Gentile testified that a single lineup, including both defendant and Calvin, was composed on February 22. However, police procedure encouraged having lineup participants who resembled the suspect and discouraged having two suspects in the same lineup. Gentile explained that he could not find enough fillers or random similar persons in the police station for two lineups, and he found it "very difficult to get somebody off the street" as a filler. He tried to find fillers on the street but was unsuccessful. The lineup had to be held that day because a suspect has to be charged within 48 hours of arrest. Defendant and Calvin stood next to each other in the lineup, and Gentile testified that lineup participants are allowed to "sit wherever they want, and that's where they chose to sit." While the police adopted a policy that an independent administrator should conduct photographic arrays and lineups, it did not take effect until after Yarbor viewed his arrays and lineup. The new procedure was applied when Vanessa viewed her arrays. Gentile acknowledged that he made several mistakes in his grand jury testimony but maintained that "the facts of the case didn't change" in his account then, "the players in the game were inverted" instead.

¶ 32 The parties stipulated that five fingerprints were found on a tablet box in Yarbor's office, none of which matched any defendant and two of which matched Yarbor.

¶ 33 2. Mid-Trial Rulings

¶ 34 Before the State rested, defendants sought to bar Chandler from testifying and to strike the testimony of Officer Campbell and Detective Gentile regarding the license plate number, arguing that it could not come in as substantive evidence because Yarbor did not testify to the actual license plate number he saw and gave to Officer Campbell. The State argued that Yarbor gave police the number in the heat of the moment just after the robbery so it had indicia of reliability and should not be barred as hearsay. The court granted the defense motions, striking testimony regarding the plate number itself—but not general discussion of using a plate number in the police investigation—and barring Chandler as a witness.

¶ 35 Defendants moved for mistrial, arguing that the jury heard the license plate evidence. The court denied a mistrial, noting that it was proper for Yarbor to testify that he provided police a plate number and for the police to testify that they took certain actions as a result "as long as you don't argue the fact about a license plate number being probative of *** guilt or innocence."

¶ 36 The court admonished the jury that it heard testimony "about a particular license plate number" and "are to disregard that number" and "not to consider the fact of that number in your deliberations."

¶ 37 3. Defense Case

¶ 38 Theresa Brown (Theresa) testified that she went to a sick neighbor's apartment at about 2 p.m. on February 20, 2014, to check on him. Calvin was the sick man's nephew and lived in the apartment. He was there sitting on the sofa watching television when she entered. When she stopped by every 20 minutes to check on the sick neighbor, Calvin was still there. On cross-examination, she admitted to being a friend of Calvin and testified that she went to his apartment daily to care for his sick uncle until he died.

¶ 39    Codefendant Calvin testified that he was home, in the apartment he shared with his aunt and uncle, between 2 p.m. and 3 p.m. on February 20, 2014. Theresa visited his apartment during that time. Calvin considered her to be a friend of the family, and she frequently came to his home to take care of his uncle. Calvin was arrested at home on February 22 for a misdemeanor cannabis offense. He had seen defendant in the neighborhood but did not know him. Calvin lived at another address before living with his aunt and uncle, and he denied living at two addresses simultaneously.

¶ 40    The parties stipulated that Calvin was arrested for misdemeanor possession of cannabis on February 22, 2014, at the apartment he shared with his aunt and uncle, but his identification card showed the other address.

¶ 41    Andrew Garth testified that he drove defendant, his friend for over seven years, to defendant's session at a recording studio on the afternoon of February 20, 2014, and was with defendant there from about 2:15 p.m. until about 3:15 p.m. As he was driving defendant while his license was suspended, Garth was with defendant after they left the studio until about 5 p.m. On cross-examination, Garth testified that he knew Calvin as well as defendant, and that Calvin and defendant knew each other. Garth testified that video was often taken in the course of recording a performer at the recording studio, but there was no video showing defendant recording there on the day in question.

¶ 42                             4. Instructions, Et Cetera

¶ 43    Defendants unsuccessfully moved for directed verdicts without argument.

¶ 44    Defendants challenged the jury instruction on circumstantial evidence, arguing that "certain hearsay evidence *** was brought in improperly" without a proper foundation. The court overruled, finding "there's some evidence of circumstantial evidence, not a great deal."

¶ 45    The jury was instructed on armed robbery with a firearm and on aggravated kidnapping. For purposes of the latter charge, where the alleged aggravation was that defendants committed aggravated battery against Yarbor, the instructions defined aggravated battery as insulting or provoking contact while using a dangerous weapon other than discharging a firearm. The jury was instructed before and after closing arguments that arguments are not evidence and arguments not supported by evidence or reasonable inferences from the evidence should be disregarded.

¶ 46    In its main closing argument, the State set forth its version of events. After describing the robbery and events preceding the robbery, the State argued that defendant and Calvin left Yarbor's office, then Yarbor followed them to "a waiting vehicle which neither of these two men went into the driver's seat." Yarbor

        "got their license plate from the vehicle. He came right back inside and called the police. He gave them the license plate number. The police ran that license plate number, and it comes back to a registered owner. The registered owner had a young man, went to speak with the police. *** After speaking with the woman and the young man, the police went out looking for these two defendants."

Yarbor then identified defendant and Calvin, and Vanessa later identified them as well.

¶ 47    There were no defense objections during the State's main argument.

¶ 48    Calvin's counsel argued that he was arrested at home for a minor offense, he did not know defendant, he would not have stood next to defendant in the lineup if he had committed a crime

with him, and Calvin's alibi from Theresa cast doubt on Yarbor's identifications. Counsel also argued that Yarbor's identifications and other testimony were unreliable because he wore glasses, did not keep records of large amounts of cash, and told police that two tablets were taken but testified that three were stolen. Counsel noted that Yarbor mentioned defendant threatening Cousins and Vanessa but neither testified to being threatened. Counsel argued that the lineup was not conducted according to proper procedure, including conducting a separate lineup for each suspect. Counsel noted that Cousins made no identification and that no fingerprint or other forensic evidence linked Calvin to the robbery. Counsel noted that Vanessa made no identification until long after the robbery, after telling the ASA that she could not make an identification, and argued that Vanessa did not go to the police station in November 2015 voluntarily and felt "threatened." Counsel argued that Yarbor was robbed but not kidnapped because he was not secretly confined.

¶ 49    Defendant's counsel agreed with the arguments of Calvin's counsel and added that the case was "an avalanche of errors," including the lineup and Detective Gentile's grand jury testimony. Counsel noted that Cousins could not make an identification, no fingerprints tied defendant to the crime, and Garth testified to where defendant was at the time of the robbery.

¶ 50    In rebuttal, the State argued that defendant and Calvin were on trial rather than Yarbor. Yarbor was "a hero, because he was able to compose himself enough to write down that license plate number that lead[ ] right to these two defendants." (No objection was made to this argument.) The discrepancies in Yarbor's accounts and the deviations from police procedure in the lineup were not impeaching. Moreover, Yarbor's identifications were corroborated by Vanessa. The State characterized the argument that Vanessa's testimony was not reliable as the ASA "going to go out on a conspiracy." The State argued that the ASA was not "threatening her with throwing her in the jail" merely by subpoenaing Vanessa and that she came to the police station "of her own volition." (No objection was made to this argument.) The State argued that Yarbor and Vanessa were "held hostage" by defendant and Calvin and could "not forget their faces." The State noted that, while Theresa testified that Calvin was home during the robbery, she also testified that she went to his home daily to care for his uncle. The State argued that Garth was biased by his friendship with defendant and noted Garth's testimony that Calvin knew defendant, contradicting Calvin's testimony that he did not know defendant.

¶ 51    Following deliberations, the jury found both defendant and Calvin guilty of armed robbery with a firearm and aggravated kidnapping.

¶ 52                                    D. Posttrial

¶ 53    Defendant filed a posttrial motion claiming insufficiency of the evidence, error in allowing hearsay evidence regarding the plate number, and improper rebuttal closing argument by the State expressing the prosecutor's personal opinion of defendant's credibility and guilt.

¶ 54    At the hearing on defendant and Calvin's posttrial motions, defendant's counsel argued insufficiency of the evidence generally, noted the lack of evidence that Yarbor was kidnapped, challenged the license plate evidence, and argued the State's improper rebuttal argument. The court denied the motions without significant comment.

¶ 55    Following a sentencing hearing, the court sentenced defendant to concurrent prison terms of 21 years. Defendant's postsentencing motion was granted insofar as the sentence for aggravated kidnapping was reduced to eight years because a firearm enhancement applied to

armed robbery, but not aggravated kidnapping, as charged. Defendant timely filed this appeal.[2]

¶ 56                                    III. ANALYSIS
¶ 57                                    A. Sufficiency
¶ 58        Defendant first contends that the trial evidence was insufficient to convict him beyond a reasonable doubt.

¶ 59        On a claim of insufficient evidence, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the testimony and other evidence, and the trier of fact is better equipped than this court to do so as it heard the evidence. *Id.*; *In re Jonathon C.B.*, 2011 IL 107750, ¶ 59. Thus, we do not retry a defendant. *Harris*, 2018 IL 121932, ¶ 26. The trier of fact is not required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. Stated another way, the State need not disprove or rule out all possible factual scenarios at trial. *Id.* ¶ 27. The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Id.*; *Jonathon C.B.*, 2011 IL 107750, ¶ 60. A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Harris*, 2018 IL 121932, ¶ 26.

¶ 60        Here, taking the evidence in the light most favorable to the State as we must, we do not find the evidence of defendant's guilt to be so unreasonable, improbable, or unsatisfactory as to have any reasonable doubt of his guilt. Yarbor, Cousins, and Vanessa gave a generally consistent account of the robbery: a short-haired robber and a dreadlocked robber entered Yarbor's office, each armed with a firearm. The short-haired robber forced Yarbor into the back room while the dreadlocked robber stayed with Cousins and Vanessa. Cousins and Vanessa heard a strike and exclamation corresponding to Yarbor's testimony that the short-haired robber struck him, and Cousins and Vanessa corroborated Yarbor's testimony that at least one tablet was stolen, including one taken by defendant personally.

¶ 61        Yarbor and Vanessa each made multiple identifications, before and during trial, of defendant and Calvin as the robbers. As the robbery took minutes rather than seconds, both Yarbor and Vanessa had ample opportunity to view the robbers. (Conversely, Cousins explained her inability to make an identification when she testified that she focused on her child during the incident.) Yarbor made his pretrial identifications within two days of the incident. While Vanessa did not make her pretrial identification until over a year after the robbery, she testified affirmatively that she remembered the robbers' faces.

¶ 62        Most notably, Yarbor and Vanessa viewed different photographic arrays several months apart from which each identified defendant; that is, none of the same photographs except for

---

[2]Calvin was sentenced to concurrent prison terms of 24 years, with aggravated kidnapping reduced to 8 years upon his postsentencing motion. We have already decided Calvin's appeal. *People v. Calvin*, 2019 IL App (1st) 161263-U.

defendant's were in the array shown to Yarbor and the array shown to Vanessa.[3] We also consider it significant that Vanessa was not the victim of the armed robbery as Yarbor was: it was Yarbor's office that was invaded at gunpoint, and it was not Vanessa's property that was stolen. Similarly, while Yarbor was threatened and struck by Calvin, defendant assured Vanessa and Cousins that he would not harm them. Lastly, we do not consider Vanessa's identifications impeached by the fact that she cooperated with authorities after the day of the robbery only after being subpoenaed; that does not by itself render her account or identifications the result of threats or intimidation. Vanessa's trial testimony does not strike us as reluctant, hesitant, or uncooperative. She clearly repudiated her September 2015 representation to the ASA that she could not make identifications, and she testified to contacting the authorities to report that she could make identifications.

¶ 63    Against this evidence, defendant presented an alibi of a long-time friend who also contradicted Calvin's testimony that he did not know defendant. Calvin presented an alibi that he was home during the robbery while his corroborating alibi witness cared for his uncle, which she testified to doing daily. Again taking the evidence in the light most favorable to the State, we are not left with any reasonable doubt of defendant's guilt.

¶ 64                                    B. Motion to Suppress

¶ 65    Defendant contends that the trial court erred in denying his motion to suppress pretrial identifications, as the photographic array and lineup shown to Yarbor were unduly suggestive.

¶ 66    However, defendant's posttrial motion did not challenge the denial of his motion to suppress. Generally, a claim is forfeited when not raised both at trial and in the posttrial motion. *People v. Reese*, 2017 IL 120011, ¶ 60. We may consider a forfeited claim under the plain-error doctrine, under which we consider a clear or obvious error if either (1) the trial evidence was closely balanced or (2) the error was so serious as to deny the defendant a fair trial and challenge the integrity of the judicial process. *Id.* A defendant claiming plain error has the burden of showing plain error, and the first step in plain-error analysis is determining whether an error occurred at all. *Id.* We need not determine whether there was error, much less clear and obvious error, here because we cannot conclude that the evidence here was closely balanced nor that any error regarding defendant's motion to suppress was so serious as to deny him a fair trial and challenge the integrity of the judicial process. Notably, defendant's motion challenged Yarbor's array and lineup identifications of defendant. However, regardless of any flaws in the array and lineup presented to Yarbor, Vanessa made her pretrial identification of defendant from a different array as noted above. For the reasons already set forth (*supra* ¶ 62), we find that Vanessa's identifications of defendant before and during trial stand independent of Yarbor's identifications. The fact that Vanessa independently made the same identifications as Yarbor tends to indicate that Yarbor's identifications were not the result of undue suggestion or impropriety.

¶ 67                                          C. Hearsay

¶ 68    Defendant contends that he was deprived of a fair trial when the State was allowed to elicit testimony implying that codefendant Thomas had implicated defendant, which constituted

___

[3]Yarbor and Vanessa were shown essentially the same photographic array including, and from which each identified, Calvin.

hearsay and violated defendant's right to confront witnesses against him. The State responds that defendant forfeited such a claim and that trial counsel was not ineffective for not preserving the claim because the testimony at issue was proper.

¶ 69     Hearsay—"a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"—is generally inadmissible, with various exceptions. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); R. 802 (eff. Jan. 1, 2011). Conversely, an out-of-court statement is not hearsay if it is offered for some purpose other than to establish the truth of the matter asserted. *People v. Hanson*, 238 Ill. 2d 74, 102 (2010). The constitutional right to confront witnesses against oneself is not implicated by a testimonial out-of-court statement offered for a purpose other than establishing the truth of the matter asserted. *People v. Darr*, 2018 IL App (3d) 150562, ¶ 67 (citing *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004)). Thus, a police officer may testify regarding the steps taken in an investigation of a crime when such testimony is necessary to fully explain the State's case, though such testimony shall not include the substance of any conversation with a person who is not testifying. *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 18. An "officer's testimony recounting steps taken in the course of an investigation may be admissible without violating a defendant's confrontation rights, even though the officer's description of the progress of the case might suggest that nontestifying witnesses implicated the defendant." *People v. Johnson*, 116 Ill. 2d 13, 24 (1987).

¶ 70     Evidentiary rulings, including whether to grant a motion *in limine*, are generally within the trial court's sound discretion and not reversed absent an abuse of discretion. *People v. Way*, 2017 IL 120023, ¶ 18; *Reese*, 2017 IL 120011, ¶ 75. A court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the court's view. *People v. Peterson*, 2017 IL 120331, ¶ 125. The admission of hearsay evidence is harmless error if there is no reasonable probability that the trier of fact would have acquitted the defendant absent the hearsay testimony. *Matthews*, 2017 IL App (4th) 150911, ¶ 23.

¶ 71     As a threshold matter, we note that defendant raised a hearsay claim regarding Thomas's statement in the motion *in limine* but failed to preserve the claim in his posttrial motion. Our supreme court has held that an issue in a criminal case is not forfeited if raised in both a hearing *in limine* and the posttrial motion. *People v. Denson*, 2014 IL 116231. As defendant did not do so, we may consider this claim only under the plain-error doctrine, under which we consider a clear or obvious error if either (1) the trial evidence was closely balanced or (2) the error was so egregious as to deny the defendant a fair trial. *Reese*, 2017 IL 120011, ¶ 69. A defendant claiming plain error has the burden of showing plain error, and the first step in plain-error analysis is determining whether an error occurred at all. *Id.*

¶ 72     Here, Officer Campbell and Detective Gentile testified strictly to the course of their investigation that led to defendant and codefendant Calvin. Yarbor provided Campbell a license plate number shortly after the robbery. Campbell provided the plate number to Gentile, who found that the plate was for a Kia registered to Chandler, and asked officers to speak with Chandler. Chandler later came to the police station with codefendant Thomas. After speaking with Chandler, Gentile spoke with Thomas. After speaking with Thomas, Gentile investigated defendant and Calvin. Consistent with the order *in limine*, the State never elicited the content of Thomas's conversation with Gentile, and nobody testified to such content.

¶ 73     Defendant argues that this testimony implies that Thomas implicated defendant and Calvin. However, this court has held that an officer's testimony was not hearsay when it was "correctly

- 12 -

limited to the investigatory steps he took leading up to the identification of defendant and demonstrated defendant's arrest was not purely coincidental" and the officer did not testify to the substance of any statement by a nontestifying person. *People v. Davison*, 2019 IL App (1st) 161094, ¶¶ 32-34. As we said in *Davison*, "[w]hile the implication of his testimony is that [a nontestifying person] provided the names of [the] defendant and two others as individuals connected to [a] murder, this implication does not render the testimony hearsay or inadmissible." *Id.* ¶ 32 (citing *Johnson*, 116 Ill. 2d at 24). Similarly, while Detective Gentile's testimony implies that Thomas implicated defendant and Calvin in the armed robbery of Yarbor, that implication does not render the testimony hearsay or inadmissible because nobody testified to the content of any statement by or interview with Thomas. We conclude that the testimony regarding the license plate number and Thomas's interview was not inadmissible or improper. Thus, there was no plain error here, and trial counsel was not ineffective for not preserving a meritless claim.

¶ 74                                      D. Improper State Remarks

¶ 75        Defendant also contends that the State made improper remarks or arguments. He argues that the State vouched for Vanessa's credibility, including a prosecutor effectively presenting testimony. The State responds that the arguments were proper.

¶ 76        Prosecutors are afforded wide latitude in closing argument and may properly comment on the evidence presented or reasonable inferences drawn from that evidence, may respond to comments by defense counsel that invite response, and may comment on witness credibility. *People v. Kallal*, 2019 IL App (4th) 180099, ¶ 35; *People v. Olla*, 2018 IL App (2d) 160118, ¶¶ 40-41. A prosecutor is not allowed to misstate the evidence, argue facts not in evidence, or attempt to shift the burden of proof to the defense. *Olla*, 2018 IL App (2d) 160118, ¶ 41; *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47. It is improper for a prosecutor to make remarks with the sole effect of inflaming the jury's passions or developing its prejudices without casting any light on the issues. *Darr*, 2018 IL App (3d) 150562, ¶ 71. Conversely, commentary that inflames the jury's passions is not improper if it also serves a proper purpose. *Id.*

¶ 77        The trial court can cure erroneous statements made during arguments by giving proper jury instructions on the law, reminding the jury that arguments are not evidence and should be disregarded if unsupported by the evidence, or by sustaining an objection and instructing the jury to disregard the improper statement. *Kallal*, 2019 IL App (4th) 180099, ¶ 35.

¶ 78        Our review considers closing arguments in their entirety and considers remarks in context, and improper remarks do not merit reversal unless they cause substantial prejudice to the defendant. *Id.* Substantial prejudice exists when the jury could have reached a contrary verdict had the improper remarks not been made or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the conviction. *Id.* The strength of the evidence against the defendant is often a decisive factor in this determination. *Marzonie*, 2018 IL App (4th) 160107, ¶ 48.

¶ 79        Here, as a threshold matter, we note that defendant did not object contemporaneously to the State's remarks regarding Vanessa, though he raised a claim of improper argument in his posttrial motion. A claim is forfeited unless a contemporaneous objection was made and a written posttrial motion raised the issue, and forfeiture may be overcome under a plain-error analysis. *Reese*, 2017 IL 120011, ¶¶ 68-69. As noted above, the first step in plain-error analysis is determining whether an error occurred at all. *Id.* ¶ 69.

¶ 80      Examining the State's remarks in context, we do not find them improper. The trial evidence showed that the ASA in question interviewed Vanessa pursuant to subpoena, at which time Vanessa said she could not make an identification, but then Vanessa contacted the authorities to report that she could make an identification, followed by her doing so. The defense argued in closing that the State threatened or intimidated Vanessa into her identifications, and the State's argument at issue was made in response to the defense argument. We do not find that the ASA testified in her argument, as defendant claims, but merely argued reasonable inferences from trial evidence. Moreover, we do not find the evidence of defendant's guilt to be closely balanced, and thus any error in the closing arguments was not plain error.

¶ 81                                    E. Ineffective Assistance

¶ 82      Defendant contends that trial counsel rendered ineffective assistance by not impeaching Detective Gentile at trial with his testimony from the hearing on the motion to suppress and by not reopening that motion when Gentile contradicted his earlier testimony at trial. Specifically, Gentile testified in the hearing that he personally showed photographic arrays to Yarbor but testified at trial that other officers showed Yarbor the arrays.

¶ 83      To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *Peterson*, 2017 IL 120331, ¶ 79. A reasonable probability is one sufficient to undermine confidence in the outcome of the proceeding. *Id.*

¶ 84      Here, we cannot conclude that the outcome of the trial was reasonably probable to change if Detective Gentile was impeached with his erroneous hearing testimony. Yarbor's trial testimony independently established that he was shown the photographic arrays in question, and he indeed made identifications from those arrays. As to impeachment of Gentile, the jury already heard that he made significant mistakes in his grand jury testimony in which he "inverted" the defendants' roles in describing the robbery.

¶ 85      We also cannot conclude that seeking to reopen the motion to suppress identification was reasonably probable to change the outcome of the case. The same reasoning that causes us to find no plain error in the denial of the motion to suppress—that the motion concerned Yarbor's identifications but Vanessa made independent identifications—causes us to find no prejudice from not reopening the motion.

¶ 86                                    F. Aggravated Kidnapping

¶ 87      Lastly, defendant contends that the State failed to prove him guilty of aggravated kidnapping because the asportation of Yarbor was merely incidental to armed robbery. The State responds that the evidence was sufficient to convict defendant of aggravated kidnapping.

¶ 88      A person commits aggravated kidnapping when he commits kidnapping and inflicts great bodily harm, or commits another felony, upon the kidnapping victim. 720 ILCS 5/10-2(a)(3) (West 2014). A person commits kidnapping when he knowingly "by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will" (720 ILCS 5/10-1(a)(2) (West 2014)), which is referred to as asportation. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009). In determining whether an asportation supports an independent offense of kidnapping or is merely ancillary to another

offense, we consider (1) the duration of the asportation, (2) whether the asportation occurred during the commission of a separate offense, (3) whether the asportation is inherent in the separate offense, and (4) whether the asportation created a significant danger to the victim independent of the separate offense. *Id.* at 225-26. Our analysis is particular to the facts and circumstances of the case before us. *People v. Sumler*, 2015 IL App (1st) 123381, ¶ 56. Whether a kidnapping or aggravated kidnapping conviction should be reversed on the grounds that the asportation was incidental to another crime is a question of the sufficiency of the evidence, not a question of law reviewed *de novo*. *Id.* ¶¶ 52-53.

¶ 89     Here, even taking the evidence in the light most favorable to the State as we must, we find that the asportation of Yarbor to the back room of his office was ancillary to armed robbery and does not support an independent conviction for aggravated kidnapping. Turning to the first of the relevant factors, duration of the asportation, we find that Yarbor was detained relatively briefly, temporally for a few minutes and functionally for as long as it took codefendant Calvin to force Yarbor to open the safe and yield the property inside. As to whether the asportation occurred during the commission of a separate offense, the answer is clearly "yes." Calvin forced Yarbor into the back room of his office at gunpoint after demanding to know where the safe was, and Yarbor was left alone once Calvin had what he came for from the safe.

¶ 90     As to whether the asportation here was inherent in the separate offense, while armed robbery in the abstract does not require taking the victim elsewhere, Calvin took Yarbor into the back room at gunpoint to obtain the contents of his safe; that is, to rob him. Lastly, as to whether the asportation created a significant danger to Yarbor independent of the separate offense, we conclude that it did not. Yarbor indeed faced greater danger than the other people in his office watched over by defendant, as shown by Calvin striking Yarbor's head and contemplating shooting him. However, that greater danger arose from Yarbor being the proprietor of the tax firm and the owner of the safe in his office, not because Calvin led him into the back room. In other words, as Calvin and defendant were armed, Yarbor would have been effectively just as far beyond the help of Cousins or Vanessa if he had been in the front room of his office as he actually was in the back room with Calvin.

¶ 91                                IV. CONCLUSION
¶ 92     Accordingly, we reverse defendant's aggravated kidnapping conviction. We otherwise affirm the judgment of the circuit court

¶ 93     Affirmed in part and reversed in part.