2021 IL App (1st) 182370-U

SIXTH DIVISION
June 25, 2021

No. 1-18-2370

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 2375 |
| | ) | |
| DOUGLAS ASKEW, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's convictions for first degree murder and attempted murder are affirmed. We reject his claims that the court erroneously admitted his prior conviction and that the prosecutor committed misconduct at closing arguments. We correct defendant's mittimus pursuant to the one-act, one-crime rule, and remand for the limited purpose of conducting a preliminary inquiry regarding defendant's *pro se* posttrial ineffective assistance of counsel claim.

¶ 2    Following a jury trial, defendant Douglas Askew was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) and attempted murder (720 ILCS 5/8-4(a) (West 2016); 720 ILCS 5/9-1(a)(1) (West 2016)), and was sentenced to natural life in prison and a consecutive 30-year sentence. He appeals, alleging that the trial court erred by permitting the State to impeach him

with his prior conviction for murder and that the prosecutor committed misconduct during closing arguments by misstating the evidence. Mr. Askew further alleges that the trial court failed to conduct a preliminary inquiry respecting his *pro se* posttrial claim for ineffective assistance of counsel, and that his mittimus incorrectly reflects two convictions for first degree murder. For the following reasons, we affirm Mr. Askew's convictions, correct his mittimus, and remand for the limited purpose of a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 3                                                    I. BACKGROUND

¶ 4      Mr. Askew was charged by indictment with 22 counts following an incident on December 31, 2016. The charges included the first degree murder of Sylvia Brice and the attempted murder of Ms. Brice's niece, Montra Tuffour. In his response to discovery, Mr. Askew raised the affirmative defense of self-defense.

¶ 5      Mr. Askew filed a motion that asked the court to bar the use of his prior conviction for murder if he chose to testify. The trial court denied the motion. Although the court acknowledged that the murder conviction was "very prejudicial," it determined that it should be admitted because Mr. Askew was claiming self-defense, meaning his testimony would be "very significant and very important to the jury's considerations" and "it would be more helpful to the jury to know about this serious baggage." The court said that the conviction "would help the jury assess his credibility, [and] be more probative than prejudicial," notwithstanding "some prejudicial effect."

¶ 6      At trial, Ms. Tuffour testified that Ms. Brice and Mr. Askew started dating in September 2016. Ms. Brice and Mr. Askew were unofficially "married" in a ceremony performed by his mother, but were never legally married. At some point, Ms. Brice procured an order of protection against Mr. Askew.

¶ 7      On December 24, 2016, Ms. Tuffour, Ms. Brice, and Ms. Brice's son Roberto Pasco went

to Ms. Brice's home on the 9300 block of South Wentworth Avenue in Chicago to change the locks on the home's three doors. Ms. Brice was staying with a family friend at the time because she "was afraid for her life." Mr. Pasco changed the locks on two of the doors.

¶ 8     On December 31, 2016, Ms. Tuffour and Ms. Brice went to Ms. Brice's home to retrieve a dog cage. Ms. Tuffour brought a knife and scissors to open boxes. The two entered the home, and Ms. Brice went upstairs to the bathroom. Moments later, Ms. Tuffour heard Ms. Brice "yell out in shock." Ms. Tuffour ran up the stairs and asked if Ms. Brice was alright. Mr. Askew opened the bathroom door. Ms. Tuffour asked him why he was there and said she would call the police. She then retrieved Ms. Brice's phone and dialed 9-1-1.

¶ 9     While Ms. Tuffour was on the phone, Mr. Askew stabbed her right side with a butcher knife. She "fell back," and Ms. Brice tried to stop Mr. Askew from attacking Ms. Tuffour. Mr. Askew stabbed Ms. Brice in the chest, and she fell on Ms. Tuffour. Mr. Askew then stabbed Ms. Tuffour four times on her left side while she was on the floor. Ms. Tuffour noticed that Mr. Askew had an injury to his hand, which she believed was self-inflicted.

¶ 10    Ms. Tuffour gained control of the butcher knife by holding it "inside" of her, then ran out the front door and into her vehicle. Mr. Askew initially followed her, but then stayed inside the house and locked the front door. Eventually, police officers and paramedics arrived, and Ms. Tuffour went to the hospital, where she stayed for two days. Ms. Tuffour spoke with detectives in the hospital and identified Mr. Askew in a photo array. She received treatment for stab wounds to her stomach, left hip, buttocks, and upper right side. The treating doctor testified that Ms. Tuffour had eight stab wounds, including one on her right side that penetrated her kidney and required seven staples.

¶ 11    The State published People's Exhibit No. 29, an audio recording of Ms. Tuffour's 9-1-1

call. On the recording, Ms. Tuffour requests assistance at Ms. Brice's home because a man against whom Ms. Brice had an order of protection was there. At some point during the call, someone screams in the background, and Ms. Tuffour stops responding to the operator's questions.

¶ 12    Ms. Tuffour further testified that she neither threatened Mr. Askew nor advanced towards him while holding a knife or scissors. Her knife and scissors fell out of her pocket and onto the floor when she fell during Mr. Askew's attack. On cross-examination, Ms. Tuffour denied that she stabbed Mr. Askew with the scissors.

¶ 13    Mr. Pasco testified that he and his brother lived with Ms. Brice and Mr. Askew in 2016. In late October or early November 2016, Mr. Pasco moved out of Ms. Brice's home because Mr. Askew was "verbally aggressive" with Ms. Brice and Mr. Pasco felt "very uncomfortable." During one incident, Mr. Pasco heard Mr. Askew say, "[y]ou don't know me. You better check my record. I don't play. Don't play with me." Mr. Pasco also witnessed another incident where Mr. Askew yelled at Ms. Brice. Mr. Pasco's brother also moved out.

¶ 14    On December 24, 2016, Mr. Pasco changed the locks on the front and back door of Ms. Brice's home, but could not finish the basement door because the lock did not fit. He changed the locks because of Ms. Brice's protective order, which she procured after Mr. Askew physically abused her.

¶ 15    Vanessa Stafford, Ms. Brice's co-worker, testified that on November 28, 2016, Ms. Brice was staying with her because Ms. Brice felt unsafe at home. That day, Ms. Stafford drove Ms. Brice home to retrieve some items. Ms. Stafford parked near the home and called the police to ask for an officer to escort Ms. Brice inside. The police did not respond "right away," and Ms. Brice entered before their arrival. Mr. Askew emerged from behind Ms. Stafford's vehicle and cornered Ms. Brice at the front door. Ms. Brice fled back to Ms. Stafford's vehicle, but Mr. Askew reached

the vehicle first and barred her entry into the passenger seat. The two spoke and he grabbed her wrists to prevent her from leaving. Ms. Stafford called 9-1-1, and eventually the police arrived and separated Ms. Brice and Mr. Askew.

¶ 16    Chicago police sergeant Regina Scott testified that on December 31, 2016, she responded to Ms. Brice's home on a report of a violation of an order of protection. En route, she received additional information that a woman had been stabbed in the home. When Sergeant Scott arrived, she found Ms. Tuffour in the back seat of a vehicle. Ms. Tuffour told Sergeant Scott about Mr. Askew's attack. Sergeant Scott forced open the locked front door and discovered Ms. Brice, who was "unresponsive." No one else was in the home.

¶ 17    The State published Sergeant Scott's body camera footage, which shows her arrive at the scene and approach an open vehicle, where she sees Ms. Tuffour. Ms. Tuffour tells Sergeant Scott that Ms. Brice is dead inside the home. Sergeant Scott calls for backup, then approaches the home to find the front door locked. She forces the door open and announces her office, then ascends the stairs and sees Ms. Brice motionless at the top of the staircase.

¶ 18    A Cook County medical examiner testified that in his opinion, Ms. Brice's cause of death was multiple stab wounds, including to the heart, and the manner of death was homicide.

¶ 19    During the police investigation, blood samples were collected from the scene for DNA testing, and buccal swabs were collected from Ms. Tuffour, Ms. Brice, and Mr. Askew.

¶ 20    The State introduced a series of stipulations based on the would-be testimony of three Illinois State Police forensic scientists. The first would testify that the scissors and the two knives collected from the scene did not contain latent fingerprints suitable for comparison. Another forensic scientist would testify that she received buccal swab standards for Mr. Askew, Ms. Brice, and Ms. Tuffour, as well as a knife recovered from a vehicle. She recovered blood standards from

the knife and identified a female DNA profile that matched Ms. Tuffour and a minor male profile from which Mr. Askew could not be excluded. The expected frequency of that minor male profile in the general population was no more than approximately 70% of all unrelated individuals. She also tested blood from the scissors and the handle of a knife recovered from the hallway, and found a female DNA profile that matched Ms. Tuffour on both. Cellular material located on the blade of the knife found in the hallway had a female DNA profile that matched Ms. Brice. And the third would testify that she extracted DNA from the handle of the knife found in the vehicle and found it matched Mr. Askew.

¶ 21    The parties further stipulated that Ms. Brice procured an emergency order of protection against Mr. Askew on November 30, 2016, with which he was served on December 2, 2016. At a hearing on December 21, 2016, the order of protection was renewed until January 20, 2017. The State read portions of the transcript from that hearing into the record and introduced certified copies of the two protective orders.

¶ 22    Mr. Askew testified that he lived with Ms. Brice in December 2016. On December 31, 2016, he entered the home through an unlocked door to "retrieve the rest of [his] belongings." At some point, Ms. Brice and Ms. Tuffour entered through the front door. Ms. Brice ascended the stairs and went to the bathroom, and then she and Mr. Askew conversed. Neither were upset, and Mr. Askew held Ms. Brice's hand. At some point, a butcher knife fell out of Ms. Brice's pant leg, and Mr. Askew picked it up. He asked Ms. Brice why she had the knife, and she said, "don't pay no attention." During the conversation, Ms. Brice called for Ms. Tuffour to come up the stairs. Ms. Tuffour approached and told Mr. Askew he was not supposed to be in the house. Ms. Tuffour then "lunged" at Mr. Askew with "a shiny silvery object," which cut his left hand.

¶ 23    Mr. Askew retrieved the butcher knife and stabbed Ms. Tuffour in the side because he

thought she "was going to kill" him. Ms. Brice then struck Mr. Askew's back with her fist, prompting him to stab Ms. Brice in the thigh because he "thought she may be complicit" in his death in a "tag team murder scenario." He did not intend to kill either Ms. Brice or Ms. Tuffour. After he stabbed Ms. Brice, he turned around and saw Ms. Tuffour in an attacking stance holding the scissors, so he stabbed her "a couple of times." She stopped attacking him, but Ms. Brice did not, so he stabbed Ms. Brice again because he feared she would kill him.

¶ 24 Ms. Tuffour exited the home, and Mr. Askew did not chase her. Mr. Askew went downstairs to close the front door, then retrieved his belongings and left. He heard Ms. Brice say his name as he left. He exited through the back door, and did not call the police because of the protective order.

¶ 25 On cross-examination, Mr. Askew testified that the butcher knife fell out of Ms. Brice's pants while the two spoke and held hands. Mr. Askew retrieved it and placed it on a bench. He did not know that Ms. Tuffour was on the phone with the police. He stabbed Ms. Brice in the "upper torso" after initially stabbing her in the thigh. He did not know that Ms. Tuffour exited the home with the butcher knife still in her side.

¶ 26 Mr. Askew recalled speaking to detectives on January 9, 2017, but denied stating that Ms. Brice was his ex-wife, he last saw her on December 21, 2016, and he did not know she was dead.

¶ 27 On redirect, the following exchange occurred:

> "Q: When you left the apartment out the back, you told the neighbor what happened, correct?
>
> A: That's correct.
>
> Q: You told the neighbor they attacked you first, correct?
>
> A: That's correct."

The court then interjected, "[o]bjection sustained. Disregard that last question and answer."

¶ 28    In rebuttal, the State recalled a detective who identified a video of Mr. Askew's statement, which the State then published. The video, which is included in the record on appeal, depicts detectives speaking with Mr. Askew. He says Ms. Brice is his ex-wife and he last saw her in court. He asks, "[w]hat about her?" and denies knowing what happened to her or that she was dead.

¶ 29    The State entered a certified copy of conviction for Mr. Askew for murder dated February 28, 1990. The trial court instructed the jury that it was to be considered "only as it may [a]ffect [Mr. Askew's] believability as a witness and must not be considered by [the jury] as evidence [of Mr. Askew's] guilt for the offense for which he is charged."

¶ 30    Prior to closing arguments, the court instructed the jury that the arguments were not evidence. During the State's closing argument, the prosecutor contended that Mr. Askew was someone who "murders" when he loses control. In rebuttal, the prosecutor argued that if Mr. Askew believed he needed to act in self-defense, he would have told the police, called 9-1-1, and told neighbors, "[l]isten to me. I know, I know I did this terrible thing, but I had to." The prosecutor also twice referred to Mr. Askew as a murder "machine." Following deliberations, the jury found Mr. Askew guilty of the first degree murder of Ms. Brice and the attempted murder of Ms. Tuffour.

¶ 31    At a later proceeding, the court denied Mr. Askew's motion for judgment of acquittal or for a new trial. In so finding, the court stated it did not believe that the prosecutor's murder "machine" comments were related to Mr. Askew's prior conviction, and that it trusted the jury to follow the court's instructions. Following a hearing, the court sentenced Mr. Askew to natural life imprisonment for first degree murder and a consecutive 30-year prison term for attempted murder.

¶ 32    After the court imposed the sentence, it asked Mr. Askew if he had any questions. He responded that he did not feel he "was represented properly at all" and that no one "attempted to

defend [him] given *** [his] self-defense plea." The court responded, "I'm not sure that we are at the stage where a *Krankel* hearing is being required, but just in deference to [Mr. Askew's] situation I will allow [defense counsel] to file a motion to reconsider sentence." At a later proceeding, the court denied Mr. Askew's motion to reconsider his sentence.

¶ 33                                    II. JURISDICTION

¶ 34    Mr. Askew's motion to reconsider his sentence was denied on October 12, 2018, and he timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 35                                    III. ANALYSIS

¶ 36              A. Admission of Mr. Askew's Prior Murder Conviction Was Proper

¶ 37    On appeal, Mr. Askew first argues that the trial court abused its discretion by permitting evidence of his prior murder conviction for purposes of impeachment because its probative value was substantially outweighed by the potential for undue prejudice.

¶ 38    Whether to admit evidence is a decision within the sound discretion of the trial court. *People v. Peterson*, 2017 IL 120331, ¶ 125. A trial court's evidentiary decisions are reviewed for an abuse of discretion, where the "question is not whether the reviewing court would have made the same decision if it were acting as the trial court." *Id.* Instead, the reviewing court will only reverse for an abuse of discretion where the trial court's decision was "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 39    A prior conviction is admissible for purposes of impeachment where (1) the crime was

punishable by death or imprisonment in excess of one year under the law at the time of the offense, or involved dishonesty or a false statement, and (2) the judge finds that the probative value of the conviction is not substantially outweighed by its potential prejudicial effect. *People v. Montgomery*, 47 Ill. 2d 510, 516; Ill. R. Evid. 609(a) (eff. Jan. 6, 2016). A conviction is inadmissible under this rule if more than 10 years has elapsed from the date of conviction or the date of the witness's release from imprisonment, whichever is later. *Montgomery*, 47 Ill. 2d at 516; Ill. R. Evid. 609(b) (eff. Jan. 6, 2016).

¶ 40    Here, Mr. Askew acknowledges that his prior murder conviction was punishable by more than a year in prison and his release from prison was within 10 years of the incident, and only challenges the trial court's determination that the probative value was not outweighed by the danger of undue prejudice. It is within a trial court's discretion to admit a defendant's prior conviction for purposes of impeachment in a trial for the same charge, though our supreme court has advised this should be done sparingly. *People v. Williams*, 161 Ill. 2d 1, 38 (1994) (discussing *Gordon v. United States*, 383 F.2d 936, 940 (1967)). "[S]imilarity alone does not mandate exclusion of the prior conviction." *People v. Atkinson*, 186 Ill. 2d 450, 463 (1999) (citing *People v. Redd*, 135 Ill. 2d 252, 326 (1990) (finding the trial court did not err in admitting the defendant's prior convictions for rape and attempted murder for impeachment in a murder trial)). Where a defendant's credibility is "a central issue," a prior conviction may be "crucial" to the jury's determination. *Id.* at 462.

¶ 41    Here, the trial court explicitly referenced the *Montgomery* balancing test during the pretrial proceeding in which it admitted Mr. Askew's murder conviction. The court also acknowledged that the conviction would likely have prejudicial effect, but found that because Mr. Askew claimed self-defense, the conviction would be "very significant and very important to the jury's

considerations." At trial, Ms. Tuffour and Mr. Askew provided the only testimony regarding the incident, with each testifying that the other was the aggressor.

¶ 42     On this record, we find that the trial court's decision to admit Mr. Askew's prior conviction for murder was not an abuse of discretion. Mr. Askew's credibility was central to the trial, and under such circumstances, a prior conviction may be "crucial" to the jury's determination. *Id.* The record is clear that the court performed the *Montgomery* balancing test conscientiously, acknowledging the conviction could have some prejudicial effect but ultimately deciding that given the circumstances of this case, the probative value was not substantially outweighed by the risk of undue prejudice.

¶ 43     Mr. Askew argues the court did not perform the balancing test correctly because it did not consider the similarity of the convictions, did not mention this factor on the record, and could have admitted Mr. Askew's aggravated battery conviction instead, which the jury was less likely to use as substantive evidence. A trial court, however, is not required to list each factor it considered in performing the *Montgomery* balancing test. See *People v. Washington*, 55 Ill. 2d 521, 523-24 (1973). Additionally, the similarity of convictions does not preclude admission, particularly where a defendant's credibility is central to the case, as it is here. *Atkinson*, 186 Ill. 2d at 462. And to the extent Mr. Askew posits that crimes of violence are not probative of truthfulness, it is well-established that admitting prior convictions that qualify under *Montgomery*, including crimes of violence, is within the trial court's discretion so long as the court reasonably engages in the *Montgomery* balancing test. See *Redd*, 135 Ill. 2d at 326.

¶ 44     Finally, Mr. Askew argues the record demonstrates that the prejudicial effect of the murder conviction substantially outweighed its probative value based on the prosecutor's references to Mr. Askew during closing arguments as someone who "murders" when he "lose[s] control" and

who was a murder "machine." Any potential prejudice from these comments, however, was mitigated by the trial court's limiting instruction that the conviction was only relevant to assess Mr. Askew's credibility. The specific facts of the murder, which also involved domestic violence, were never disclosed to the jury. Where the court provides a limiting instruction, it is presumed the jury understood and followed it, absent a showing to the contrary from the record. *Atkinson*, 186 Ill. 2d at 463; see also *People v. Wilmington*, 2013 IL 112938, ¶ 49 ("Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them.").

¶ 45    B. The Prosecutor's Comments in Closing Argument Do Not Rise to the Level of Plain Error and Defense Counsel Was Not Ineffective for Failing to Object to the Comments

¶ 46    Mr. Askew next claims that the prosecutor committed misconduct by stating during closing arguments that Mr. Askew did not tell a neighbor that he had acted in self-defense. Mr. Askew maintains this was improper because he testified that he did tell a neighbor as he exited the home, but the State objected, and the court struck the testimony. Mr. Askew acknowledges that counsel did not object during the prosecutor's closing argument, but argues this court can reach the claim on plain error review. He also alleges that the failure to preserve the error constituted ineffective assistance of counsel.

¶ 47    To preserve an error for appellate review, a party must make a timely objection at trial and include the issue in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. Unpreserved errors may be considered on plain error review, however, where a clear or obvious error occurred at trial, and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the

judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* We must first determine whether a clear or obvious error occurred. *Id.* ¶ 49.

¶ 48    During closing argument, attorneys may argue based on reasonable inferences from the evidence, and are afforded wide latitude. *People v. Cook*, 2018 IL App (1st) 142134, ¶ 61. An attorney may not, however, misstate the evidence or argue based on facts not in evidence. *People v. Short*, 2020 IL App (1st) 162168, ¶ 76. In *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), our supreme court held that whether a prosecutor's misconduct necessitated a new trial is reviewed *de novo*, although in *People v. Blue*, 189 Ill. 2d 99, 128 (2000), the court said that whether a prosecutor's statements constituted misconduct is reviewed for an abuse of discretion. *People v. Cruz*, 2019 IL App (1st) 170886, ¶ 40. In *Cook*, this court held that *Wheeler* and *Blue* are separate standards, and reviewing courts should apply them based on the nature of the alleged error. But see *People v. Phagan*, 2019 IL App (1st) 153031 (applying the *Blue* standard). In this case, our decision would be the same under either standard of review.

¶ 49    At trial, during Mr. Askew's redirect testimony, defense counsel asked, "[w]hen you left the apartment out the back, you told the neighbor what happened, correct?" Mr. Askew responded, "[t]hat's correct." Counsel then asked, "[y]ou told the neighbor they attacked you first, correct?" Mr. Askew responded, "[t]hat's correct." The court interjected, "[o]bjection sustained. Disregard that last question and answer."

¶ 50    During closing argument, the prosecutor argued that had Mr. Askew acted in self-defense, he would have told neighbors about what happened. Defense counsel did not object. Based on this record, we find that the prosecutor's statement was clear error. It is improper for a prosecutor to misstate the evidence, and here the prosecutor argued that Mr. Askew did not tell a neighbor what happened, although his testimony was the opposite. See *Short*, 2020 IL App (1st) 162168, ¶ 76.

Under either a *de novo* or abuse of discretion standard, this was error. Therefore, we turn to whether this error qualifies as plain error, under either the first or second prong.

¶ 51    Regarding first-prong plain error, we must determine if the evidence was closely balanced. In making this determination, the court must perform a "qualitative, commonsense assessment" of the "totality of the evidence." *Sebby*, 2017 IL 119445, ¶ 53. When a case is based solely on testimony on both sides, without additional corroborating or extrinsic evidence, the case may be considered a "credibility contest" and, if both versions were credible, the evidence would be closely balanced. *Id.* ¶ 63 (citing *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008)). A reviewing court is not required to consider such a situation closely balanced, however, where one party's version is implausible or where additional evidence corroborates one party's account. See *People v. Scott*, 2020 IL App (1st) 180200, ¶ 51.

¶ 52    We find that the evidence here was not closely balanced both because Mr. Askew's version was not credible and because there was corroborative evidence to support Ms. Tuffour's account. Ms. Tuffour testified that when she and Ms. Brice entered the home, Mr. Askew was already present, and after Ms. Tuffour told him she was calling the police, he attacked them both with a butcher knife. This account was corroborated by the 9-1-1 call, on which Ms. Tuffour explains to the operator that Mr. Askew was in the house in violation of a protective order, and screaming begins while the call is in progress.

¶ 53    Mr. Askew testified that he and Ms. Brice spoke amicably while holding hands, at which point a butcher knife fell out of her pants. Ms. Tuffour then attacked Mr. Askew with a sharp object, prompting him to retrieve the butcher knife and repeatedly stab both Ms. Tuffour and Ms. Brice in fear for his life.

¶ 54    Mr. Askew's version of events is objectively implausible and, unlike Ms. Tuffour's, is

unsupported by any extrinsic evidence. This is simply not a credibility contest between two credible versions of events such that the evidence is closely balanced. See *People v. Adams*, 2012 IL 111168, ¶ 22 (evidence was not closely balanced where the defendant's version of events was "highly improbable"); *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 89-90 (*Naylor* was "inapposite" because the defendant's version of events was not credible); *People v. Anderson*, 407 Ill. App. 3d 662, 672 (2011) (evidence was not closely balanced where the jury was "not faced with two equally credible versions of events").

¶ 55    On second-prong plain-error review, reversal based on prosecutorial misconduct is only appropriate where the prosecutor's conduct constituted a "a pervasive pattern of unfair prejudice." *People v. Johnson*, 208 Ill. 2d 53, 84 (2003). The conduct at issue must be so severe that it "cast doubt upon the reliability of the judicial process." *Id.* Here, the prosecutor's misstatement did not constitute a "pervasive pattern" of misconduct that cast doubt on the judicial process. Rather, it was an isolated comment, and the court instructed the jury that closing arguments are not evidence. Second-prong plain-error review is not appropriate.

¶ 56    We also reject any argument that defense counsel provided ineffective assistance by not objecting to the prosecutor's misstatement. To establish ineffective assistance of counsel, a defendant must demonstrate that his attorney engaged in objectively unreasonable conduct and that but for this conduct, the result of his trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984).

¶ 57    In this case, Mr. Askew cannot show prejudice. Mr. Askew's version of events was incredible, while the testimony of Ms. Tuffour, the State's other witnesses, and the 9-1-1 call provided ample evidence of Mr. Askew's guilt, regardless of what he may or may not have told a neighbor. It is thus unlikely that the prosecutor's comment so influenced the jury that the verdict

would have been different absent the misstatement. Where a defendant cannot establish prejudice, the reviewing court need to not consider whether counsel's conduct was objectively unreasonable. *People v. Givens*, 237 Ill. 2d 311, 331 (2010). See also *People v. Clay*, 379 Ill. App. 3d 470, 484 (2008) (no ineffective assistance of counsel where the defendant could not show prejudice for failure to object to improper closing because the evidence against the defendant was "overwhelming" and the court instructed the jury that closing arguments were not evidence).

¶ 58        C. The Trial Court Should Have Conducted a Preliminary *Krankel* Inquiry

¶ 59    Mr. Askew next claims, and the State concedes, that this matter should be remanded for the limited purpose of conducting a preliminary *Krankel* inquiry to address Mr. Askew's *pro se* posttrial claim of ineffective assistance of counsel.

¶ 60    When a defendant makes a *pro se* posttrial claim of ineffective assistance of counsel, the trial court must conduct an inquiry to discover the factual bases underlying the claim. *Krankel*, 102 Ill. 2d at 189; see also *People v. Ayres*, 2017 IL 120071, ¶ 11. During the hearing, the court may inquire of the defendant himself, query defense counsel, and rely on its knowledge of the proceedings. *People v. Moore*, 207 Ill. 2d 68, 78-79 (2003). If the court finds possible neglect, it should appoint new counsel and conduct a full hearing regarding the claim. *Id.* at 78. Where, however, the court finds that the claim lacks merit or pertains only to trial strategy, it may deny the claim without appointing new counsel. *Id.* A defendant must only bring the claim to the court's attention to require a preliminary *Krankel* inquiry and need not file a written motion. *People v. Roddis*, 2020 Il 124352, ¶ 35. Whether a defendant sufficiently raised a *pro se* posttrial claim of ineffective assistance of counsel such that a preliminary *Krankel* inquiry is required is a matter of law we review *de novo*. *People v. Taylor*, 237 Ill. 2d 68, 75-76 (2010).

¶ 61    Here, following sentencing, the trial court asked Mr. Askew whether he had any questions.

Mr. Askew responded that he did not believe he was "represented properly" and that "no one" attempted "to defend him" regarding his self-defense argument. The court stated it was not sure that a *Krankel* proceeding was necessary, but said Mr. Askew could address the issue in a motion to reconsider sentence. On this record, we agree with the parties that the court did not conduct an adequate preliminary *Krankel* inquiry. Mr. Askew's comments relayed to the court that he had specific complaints about his trial counsel, and this was sufficient to trigger the court's duty to further inquire. *Ayres*, 2017 IL 120071, ¶ 18. The court made no inquiry into the factual bases of Mr. Askew's concerns, and as such, the matter must be remanded for a preliminary *Krankel* inquiry. *Id.* ¶ 26.

¶ 62    D. The Mittimus Must Be Corrected Pursuant to the One-Act, One-Crime Doctrine

¶ 63    Finally, Mr. Askew claims, and the State also concedes, that the trial court erroneously convicted him on two counts of murder in violation of the one-act, one-crime rule. Mr. Askew's mittimus reflects two convictions for murder, one on count VI for murder predicated on intentionally or knowingly killing Ms. Brice and one on count VII for murder predicated on acting with knowledge that his conduct had a strong probability of causing death. "[A] defendant may not be convicted of multiple offense that are based upon precisely the same single physical act." *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). Here, the record is clear that Mr. Askew was guilty of a single act of murder against Ms. Brice, and we agree with the parties that he cannot have convictions on both counts VI and VII. We may correct such an error without remand to the lower court. See *People v. James*, 2017 IL App (1st) 143036, ¶ 59. Accordingly, we order that Mr. Askew's conviction on count VII be vacated, as count VI carries the more culpable mental state. See *People v. Fuller*, 205 Ill. 2d 308, 346 (2002). Resentencing is unnecessary because Mr. Askew's mittimus reflects sentences of natural life imprisonment on each of these counts.

¶ 64                          IV. CONCLUSION

¶ 65    For the foregoing reasons, Mr. Askew's conviction for attempted murder is affirmed, his conviction for first degree murder on count VI is affirmed, his conviction on count VII is vacated, with a corrected mittimus to issue, and the matter is remanded for the limited purpose of the trial court conducting a preliminary *Krankel* inquiry.

¶ 66    Affirmed in part, vacated in part; mittimus corrected; remanded with directions.